## UNITED STATES *v.* STANFORD.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 783. Argued January 28, 29, 1896. — Decided March 2, 1896.

An examination of the statutes of the United States relating to the construction of a railroad from the Missouri River to the Pacific Ocean, especially the acts of July 1, 1862, c. 120, 12 Stat. 489, and July 2, 1864, c. 216, 13 Stat. 356, shows that every subscriber to the Union Pacific Railroad Company must be deemed to have become such upon the condition, implied by law, that he should not be personally liable for the debts of the corporation.

It is equally clear that Congress intended to grant national aid to all the corporations constructing that connecting line of railroad upon terms and conditions applicable alike to all, with no purpose to make discriminations against any one part of the line, and that the imposition of a liability upon the stockholders of the Central Pacific Railroad Company for the debt of that corporation, arising out of the bonds which it received from the United States, when no such liability was imposed upon

the Union Pacific Railroad Company on account of like bonds received by it, is entirely inconsistent with that equality.

The United States has no claim against the stockholders of the Central Pacific Railroad Company on account of the bonds issued to that company by the United States to aid in the construction of its road.

This adjudication is not to be taken as deciding that the stockholders of the Central Pacific Railroad Company either can or cannot be made liable for its debts to the United States in some other way than under the Pacific railroad acts and by the acceptance of the United States bonds to aid in the construction of the road; nor whether the adoption of the California corporation as an instrument of the national government in accomplishing a national object, exempted its stockholders from liability, under the constitution and laws of California, to ordinary creditors.

THE case is stated in the opinion.

*Mr. Solicitor General* and *Mr. Assistant Attorney General Dickinson* for appellants.

*Mr. Joseph H. Choate,* (with whom was *Mr. Russell J. Wilson* on the brief,) for appellee.

MR. JUSTICE HARLAN delivered the opinion of the court.

The United States seeks by this suit to establish a claim against the estate of Leland Stanford for fifteen millions two hundred and thirty-seven thousand dollars.

The deceased held and owned a large number of the shares of the capital stock of the Central Pacific Railroad Company of California, and the Western Pacific Railroad Company — corporations that were organized under the laws of California, and which subsequently were consolidated and became the Central Pacific Railroad Company.

Those companies received bonds of the United States that were issued under the acts of Congress known as the Pacific Railroad Acts in aid of the construction of a railroad and telegraph line extending from the Missouri River to the Pacific Ocean. The present demand of the government arises out of the obligation which, it is alleged, rested upon the companies receiving such bonds to pay the principal at maturity and to reimburse the United States for all interest paid thereon.

The bill proceeds upon the ground that by the constitution and laws of California, at the time the above corporations were organized, as well as when they received the bonds of the United States, each stockholder of a railroad corporation was liable, in proportion to the stock owned and held by him, for all of its debts and liabilities, and, consequently, that the estate of Stanford is liable to the United States in proportion to the stock owned and held by him in the corporations named.

The principal contention of the defendant is, that the question of the liability of stockholders for the debts and obligations of companies receiving bonds of the United States under the Pacific Railroad Acts, does not depend upon the laws of California, but is governed by the acts of Congress under which such bonds were issued; that by its legislation in aid of the construction of the Union and Central Pacific railroads Congress intended to define, control, and regulate the entire relations of the government to all of the companies receiving subsidy bonds without reference to the laws of any State; that those companies were respectively created or adopted as agencies for a great national purpose, in the accomplishment of which they were to be subject to the exclusive control of the general government; that the functions, obligations and liabilities of all the companies participating in the bounty of the United States were to be equal and identical; and that as to each company the government looked to it alone for the performance of all that the acts imposed upon it, and did not contemplate, nor intend that there should be any individual liability of stockholders in respect of the subsidy bonds issued by the United States.

If these acts of Congress have the scope and effect attributed to them by the defendant, the decree may be affirmed without any expression of opinion by this court upon other questions discussed at the bar, and which, if considered, would require a construction of the laws of California relating to the personal liability of stockholders for the debts of railroad corporations.

Was it part of the contract between the United States and the corporations receiving its subsidy bonds that the stock-

holders of such corporations, respectively, should be personally liable for the principal and interest of those bonds? Or, did the United States make provision in the acts of Congress for all the security intended to be taken for their payment? These questions cannot be answered by referring to any one section of either act, but only by examining the provisions of all of those acts in the light of the circumstances under which the United States made grants of public lands and provided for the issuing of bonds in aid of the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean.

By the act of July 1, 1862, c. 120, 12 Stat. 489, entitled "An act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the government the use of the same for postal, military and other purposes," the Union Pacific Railroad Company was incorporated with power to lay out, locate, maintain, and enjoy a continuous railroad and telegraph from a named point in what was then the Territory of Nebraska to the western boundary of what at that time was the Territory of Nevada.

That company was given the right of way through the public lands for the construction of its railroad and telegraph line as well as the power and authority to take from those lands adjacent to the line of the road, earth, stone and timber, and other materials required in the work of construction, and so far as it was necessary to do so, to occupy the public lands, for stations, buildings, workshops and depots, machine shops, switches, side tracks, turntables and water stations; the United States to extinguish the Indian titles to all lands falling under the operation of the act and required for the right of way and grants made. "For the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war and public stores," a large grant of lands was made, for which patents were directed to be issued as each forty consecutive miles of railroad and telegraph were completed and equipped in all respects as required. §§ 2, 3, 4.

The fifth section provided that for the purposes mentioned

the Secretary of the Treasury, upon the completion and equipment of forty consecutive miles of railroad and telegraph, should issue to the company bonds of the United States, of one thousand dollars each, payable in thirty years after date, bearing six per centum per annum interest, to the amount of sixteen of said bonds per mile for such section of forty miles; and "*to secure the repayment* to the United States, as hereinafter provided, of the amount of said bonds so issued and delivered to said company, together with all interest thereon which shall have been paid by the United States, the issue of said bonds and delivery to the company shall *ipso facto constitute a mortgage on the whole line of the railroad and telegraph, together with the rolling stock, fixtures and property of every kind and description, and in consideration of which said bonds may be issued;* and on the refusal or failure of said company to redeem said bonds, or any part of them, when required so to do by the Secretary of the Treasury, in accordance with the provisions of this act, *the said road, with all the rights, functions, immunities and appurtenances thereunto belonging, and also all lands granted to the said company, by the United States, which, at the time of said default shall remain in the ownership of said company, may be taken possession of by the Secretary of the Treasury for the use and benefit of the United States.*"

The grants referred to were made "upon condition that said company shall pay said bonds at maturity, and shall keep said railroad and telegraph line in repair and use, and shall at all times transmit dispatches over said telegraph line, and transport mails, troops and munitions of war, supplies and public stores upon said railroad for the government whenever required to do so by any department thereof, and that the government shall at all times have the preference in the use of the same for all the purposes aforesaid, (at fair and reasonable rates of compensation, not to exceed the amounts paid by private parties for the same kind of service;) and *all compensation for services rendered for the government shall be applied to the payment of said bonds and interest until the whole amount is fully paid.*" The company was entitled to pay

the United States, wholly or in part, in the same or other
bonds, treasury notes or other evidences of debt against the
United States, to be allowed at par; and after the road was
completed, *until the bonds and interest were paid, at least five
per centum of the net earnings of said road were required to
be annually applied to the payment thereof.* § 6.

The company was required to file its assent to the act in
the Department of the Interior within one year after its pas-
sage, and it was allowed until the 1st day of July, 1874, to
complete its railroad and telegraph through the Territories of
the United States, to the western boundary of the Territory
of Nevada, "there to meet and connect with the line of the
Central Pacific Railroad Company of California." §§ 7, 8.

The ninth section authorized the Leavenworth, Pawnee and
Western Railroad Company of Kansas to construct a railroad
and telegraph line from the Missouri River, at the mouth of
the Kansas River, "upon the same terms and conditions in all
respects" as were provided in the act for the construction of
the railroad and telegraph line first mentioned, and to meet
and connect with the same at the meridian of longitude named;
the route in Kansas, west of the meridian of Fort Riley, to
the aforesaid point, on the one hundredth meridian of lon-
gitude, to be subject to the approval of the President of
the United States, and to be determined by him on actual
survey. By the same section it was declared that "the
Central Pacific Railroad Company of California, a corporation
existing under the laws of the State of California, are hereby
authorized to construct a railroad and telegraph line from the
Pacific coast, at or near San Francisco, or the navigable waters
of the Sacramento River, to the eastern boundary of California,
*upon the same terms and conditions, in all respects,* as are con-
tained in this act for the construction of said railroad and
telegraph line first mentioned, and to meet and connect with
the first mentioned railroad and telegraph line on the eastern
boundary of California. Each of said companies shall file
their acceptance of the conditions of this act in the Depart-
ment of the Interior within six months after the passage of
this act."

The tenth section provided that the company chartered by the State of Kansas should complete one hundred miles of its road, commencing at the mouth of the Kansas River, within two years after filing its assent to the conditions of the act, and one hundred miles per year thereafter until the whole was completed; and the Central Pacific Railroad Company of California should complete fifty miles of its road within two years after filing its assent to the provision of the act, and fifty miles per year thereafter until the whole was completed; and "after completing their roads, respectively, said companies, or either of them, may unite *upon equal terms* with the first named company in constructing so much of said railroad and telegraph line and branch railroads and telegraph lines in this act hereinafter mentioned, *through the Territories from the State of California to the Missouri River*, as shall then remain to be constructed, *on the same terms and conditions* as provided in this act in relation to the said Union Pacific Railroad Company." And the Central Pacific Railroad Company of California, after completing its road across that State, was authorized " to continue the construction of said railroad and telegraph *through the Territories of the United States to the Missouri River*, including the branch roads specified in this act, upon the routes hereinbefore and hereinafter indicated, on the terms and conditions provided in this act in relation to the said Union Pacific Railroad Company, until said roads shall meet and connect, and *the whole of said railroad and branches and telegraph is completed.*"

By the twelfth section it was declared that the " track upon the entire line of railroad and branches *shall be of uniform width*, to be determined by the President of the United States, so that, when completed, *cars can be run from the Missouri River to the Pacific coast;* the grades and curves shall not exceed the maximum grades and curves of the Baltimore and Ohio Railroad; the *whole line* of said railroad and branches and telegraph shall be operated and used for all purposes of communication, travel and transportation so far as the public and government are concerned, *as one connected, continuous line.* . . ."

The fifteenth section gave to any other railroad company then or thereafter incorporated the right to connect with the road and branches provided for by the act, at such places and upon such just and equitable terms as the President of the United States should prescribe.

All of the railroad companies named in the act, and assenting thereto, or any two or more of them, were authorized to form themselves into one consolidated company; notice of such consolidation to be in writing, to be filed in the Department of the Interior, and the consolidated company to proceed to construct the railroad, branches and telegraph line, *upon the terms and conditions* provided in the act. § 16.

The seventeenth section provided: "That in case said company *or companies* shall fail to comply with the terms and conditions of this act, by not completing said railroad and telegraph and branches within a reasonable time, or by not keeping the same in repair and use, but shall permit the same, for an unreasonable time, to remain unfinished, or out of repair, and unfit for use, Congress may pass any act to insure the speedy completion of said road and branches, or put the same in repair and use, and may direct the income of said railroad and telegraph line to be thereafter devoted *to the use of the United States*, to repay all such expenditures caused by the default and neglect of said company or companies: *Provided,* That if said roads are not completed, so as to form *a continuous line of railroad, ready for use, from the Missouri River to the navigable waters of the Sacramento River, in California,* by the first day of July, 1876, *the whole of all of said railroads* before mentioned and to be constructed under the provisions of this act, together with all their furnishings, fixtures, rolling stock, machine shops, lands, tenements and hereditaments, and property of every kind and character, *shall be forfeited to and be taken possession of by the United States: Provided,* That of the bonds of the United States in this act provided to be delivered for any and all parts of the roads to be constructed east of the one hundredth meridian of west longitude from Greenwich, and for any part of the road west of the west foot of the Sierra Nevada Mountains, there

shall be reserved of each part and instalment twenty-five per centum, to be and *remain in the United States Treasury undelivered*, until said roads *and all parts thereof provided for in this act are entirely completed ;* and of all the bonds provided to be delivered for the said road, between the two points aforesaid, there shall be reserved out of each instalment fifteen per centum, *to be and to remain in the Treasury* until the whole of the road provided for in this act is fully completed ; and if the said road or any part thereof shall fail of completion at the time limited therefor in this act, then and in that case the said part of said bonds so reserved shall be forfeited to the United States."

By the eighteenth section it was declared : " Whenever it appears that the net earnings of the *entire road and telegraph*, including the amount allowed for services rendered for the United States, after deducting all expenditures, including repairs and the furnishing, running and managing of said road, shall exceed ten per centum upon its costs, exclusive of the five per centum, to be paid to the United States, *Congress* may reduce the rates of fare thereon if unreasonable in amount, and may fix and establish the same by law. And the better to accomplish the object of this act, namely, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times (but particularly in time of war) the use and benefits of the same for postal, military and other purposes, Congress may, at any time, having due regard for the rights of said companies named herein, add to, alter, amend or repeal this act."

The several railroad companies named were authorized to enter into an arrangement with the Pacific Telegraph Company, the Overland Telegraph Company, and the California State Telegraph Company, "so that the present line of telegraph between *the Missouri River and San Francisco* may be moved upon or along the line of said railroad and branches as fast as said roads and branches are built; and if said arrangement be entered into and the transfer of said telegraph line be made in accordance therewith to the line of said

railroad and branches, such transfer shall, for all purposes of this act, be held and considered a fulfilment on the part of said railroad companies of the provisions of this act in regard to the construction of said line of telegraph. And, in case of disagreement said telegraph companies are authorized to remove their line of telegraph along and upon the line of railroad herein contemplated without prejudice to the rights of the railroad companies named herein." § 19.

The act of 1862 was amended in many particulars by the act of July 2, 1864, c. 216, 13 Stat. 356. The time for designating the general route of the Union Pacific Railroad, and of filing the map of the same, and the time for the completion of that part of the railroads required by the terms of said act of each company, was extended one year from the time designated in the act of 1862; and the Central Pacific Railroad Company of California was required to complete twenty-five miles of its road "in each year thereafter, and the whole to the state line within four years, and that only one half of the compensation for services rendered for the government *by said companies* shall be required to be applied to the payment of the bonds issued by the government in aid of the construction of said roads." § 5.

The proviso to section four of the original act was modified so that the President of the United States was authorized to appoint *for each of the roads* three commissioners, as provided for in the original act; and "the verified statement of the president of the California company, required by said section four, shall be filed in the office of the United States surveyor general for the State of California, instead of being presented to the President of the United States; and the said surveyor general shall thereupon notify the said commissioners of the filing of such statement, and the said commissioners shall thereupon proceed to examine the portion of said railroad and telegraph line so completed, and make their report thereon to the President of the United States, as provided by the act of which this is amendatory. And such statement may be filed, and such railroad and telegraph line be examined and reported on, by the said commissioners, *and the requisite amount of bonds*

*may be issued* and the lands appertaining thereto may be set apart, located, entered and patented, as provided in this act and the act to which this is amendatory, upon the construction by said railroad company of California of any portion of not less than twenty consecutive miles of their said railroad and telegraph line, upon the certificate of said commissioners that such portion is completed as required by the act to which this is amendatory." § 6.

So much of section 17 of the act of 1862 as provided for a reservation by the government of a portion of the bonds to be issued to aid in the construction of the said railroads was repealed; and it was provided that the failure of any one company to comply fully with the conditions and requirements of that act, and the act of which it was amendatory, should not work a forfeiture of the rights, privileges, or franchise of any other company or companies that should have complied with the same. § 7.

To enable any one of the corporations to make convenient and necessary connections with other roads, it was authorized to establish and maintain all necessary ferries upon and across all rivers which its road might pass in its course; and authority was given each corporation to construct over all rivers for the convenience of such road bridges having suitable and proper draws for the passage of steamboats.

The tenth section provided: "That section five of said act be so modified and amended that the Union Pacific Railroad Company, the Central Pacific Railroad Company, and any other company authorized to *participate in the construction of said road*, may, on the completion of each section of said road, as provided in this act and the act to which this is an amendment, issue their first mortgage bonds on their respective railroad and telegraph lines to an amount not exceeding the amount of the bonds of the United States, and of even tenor and date, time of maturity, rate and character of interest with the bonds authorized to be issued to said railroad companies respectively. And the lien of the United States bonds shall. be subordinate to that of the bonds of any or either of said companies hereby authorized to be issued on their respective

roads, property and equipments, except as to the provisions of the sixth section of the act to which this act is an amendment, relating to the transmission of dispatches and the transportation of mails, troops, munitions of war, supplies and public stores for the government of the United States. And said section is further amended by striking out the word 'forty,' and inserting in lieu thereof the words 'on each and every section of not less than twenty.'"

By the eleventh section it was declared that "if any of the railroad companies entitled to bonds of the United States, or to issue their first mortgage bonds herein provided for, has, at the time of the approval of this act, issued, or shall thereafter issue, any of its own bonds or securities in such form or manner as in law or equity to entitle the same to priority of preference of payment to the said guaranteed bonds or said first mortgage bonds, the amount of such corporate bonds outstanding and unsatisfied, or uncancelled, shall be deducted from the amount of such government and first mortgage bonds which the company may be entitled to receive and issue; and such an amount only of such government bonds and such first mortgage bonds shall be granted or permitted, as, added to such outstanding, unsatisfied or uncancelled bonds of the company shall make up the whole amount per mile to which the company would otherwise have been entitled. . . . *Provided, also,* That no land granted by this act shall be conveyed to any party or parties, and no bonds shall be issued to any company or companies, party or parties, on account of any road, or part thereof, made prior to the passage of the act to which this act is an amendment, or made subsequent thereto, under the provisions of any act or acts other than this act and the act amended by this act."

The twelfth section provided that the Leavenworth, Pawnee and Western Railroad Company, now known as the Union Pacific Railroad Company, Eastern Division, should build the railroad from the mouth of Kansas River, by the way of Leavenworth, or, if that be not deemed the best route, then it should, within two years, build a railroad from the city of Leavenworth to unite with the main stem at or near the city

of Lawrence; but to aid in the construction of said branch the company was to receive no bonds. And if the Union Pacific Railroad Company should not be proceeding in good faith to build its railroad through the territories, when the Leavenworth, Pawnee and Western Railroad Company, or the Union Pacific Railroad Company, Eastern Division, shall have completed its road to the hundredth degree of longitude, then the last named company may proceed to make said road westward "until it meets and connects with the Central Pacific Railroad Company on the same line."

The fifteenth section required the several companies, authorized to construct the aforesaid roads, to operate and use said roads and telegraph for all purposes of communication, travel and transportation, so far as the public and government were concerned, "*as one continuous line;* and in such operation and use to afford and secure to each equal advantages and facilities as to rates, time and transportation, without any discrimination of any kind in favor of the road or business of either or any of said companies, or adverse to the road or business of any or either of the others."

Any two or more of the companies authorized to participate in the benefits of the act were authorized, at any time, to unite and consolidate their organizations "upon such terms and conditions and in such manner as they may agree upon, and as shall not be incompatible with this act or the laws of the States in which the roads of such companies may be," and thereupon such organization, so formed and consolidated, "shall succeed to, possess and be entitled to receive from the government of the United States *all and singular the grants, benefits, immunities, guarantees, acts and things to be done and performed, and be subject to the same terms, conditions, restrictions and requirements* which said companies, respectively, at the time of such consolidation, are or may be entitled or subject to under this act, in place and substitution of said companies so consolidated respectively."   § 16.

All the provisions of this act so far as applicable, relating or in any manner appertaining to the companies so consolidated, or either thereof, were to apply to the consolidated

organization. And if, upon the completion by the consolidated organization of the roads, or either of them, of the companies consolidated, any other of the road or roads of either of the other companies authorized and forming, or intended or necessary to form, a portion of "a continuous line" from each of the several designated points on the Missouri River to the Pacific coast shall not have constructed the number of miles of its road within the time required, the consolidated organization was authorized " to continue the construction of its road and telegraph in the general direction and route upon which such incomplete or unconstructed road is hereinbefore authorized to be built, until such continuation of the road of such consolidated organization shall reach the constructed road and telegraph of said other company and at such point to connect and unite therewith; and for and in aid thereof the said consolidated organization may do and perform, in reference to such portion of road and telegraph as shall so be in continuation of its constructed road and telegraph, and to the construction and equipment thereof, all and singular the several acts and things provided, authorized or granted to be done by the company authorized to construct and equip the same," and shall be entitled to "*similar and like grants, benefits, immunities, guarantees, acts and things* to be done and performed by the government of the United States, by the President of the United States, or the Secretaries of the Treasury and Interior, and by commissioners in reference to such company, and to such portion of the road hereinbefore authorized to be constructed by it, *and upon the like and similar terms and conditions*, as far as the same are applicable thereto." "And in case any company authorized thereto shall not enter into any consolidated organization, such company, upon the completion of the road as hereinbefore provided, shall be entitled to, and is hereby authorized to, continue and extend the same under the circumstances, and in accordance with the provisions in this section, *and to have all the benefits thereof, as fully and completely as are herein provided*, touching such consolidated organization. And in case more than one such consolidated organization shall be

made, pursuant to this act, the terms and conditions of this act, hereinbefore recited as to one, shall apply in like manner, force and effect to the other: *Provided, however,* That rights and interests at any time acquired by one such consolidated organization shall not be impaired by another thereof." It was further provided that "should the Central Pacific Railroad Company of California complete their line to the eastern line of the State of California, before the line of the Union Pacific Railroad Company shall have been extended westward so as to meet the line of said first named company, said first named company may extend their line of road eastward one hundred and fifty miles on the established route, so as to meet and connect with the line of the Union Pacific road, complying in all respects with the provisions and restrictions of this act as to said Union Pacific road, and upon doing so shall enjoy *all the rights, privileges and benefits conferred by this act on said Union Pacific Railroad Company.*" § 16.

By a subsequent act, approved March 3, 1865, c. 88, the tenth section of the act of 1864 was so amended as to allow the Central Pacific Railroad Company, and the Western Pacific Railroad Company of California, the Union Pacific Railroad Company, the Union Pacific Railroad Company, Eastern Division, and all other companies provided for in the above act, to issue their six per centum thirty years' bonds, to the extent of one hundred miles in advance of a continuous, completed line of construction; further, that the assignment made by the Central Pacific Railroad Company of California to the Western Pacific Railroad Company of said State, of the right to construct all that portion of said railroad and telegraph from the city of San José to Sacramento, was ratified and confirmed to the latter company, "with *all the privileges and benefits* of the several acts of Congress relating thereto and subject to all the conditions thereof."    13 Stat. 504.

From this review of the legislation of Congress it appears that the acts of 1862, 1864, and 1865 all relate to the same general subject; and, when examined for the purpose of ascertaining the object of Congress in passing them, they

should be regarded as one enactment.   What that object was
is no longer a subject of inquiry in this court.   In *United
States* v. *Union Pacific Railroad Company*, 91 U. S. 92, this
court, speaking by Mr. Justice Davis, held that the construc-
tion of a railroad connecting the Missouri River with the
Pacific Ocean was a national work, because such a road would
be a great national highway, under national control; that the
scheme for establishing that highway originated in national
necessities, the country being involved at the time in a civil
war which threatened the disruption of the Union, and endan-
gered the safety of our possessions on the Pacific; and that
the enterprise required national assistance, because private
capital was inadequate for an undertaking of such magnitude.
It appears upon the face of the act of 1862, as amended by
the act of 1864, that Congress had in view the promotion of
the public interest and welfare by the construction of a rail-
road and telegraph line that could be used by the government
at all times, but particularly in time of war, for postal, mili-
tary, and other purposes, and that so far as the government
and the public were concerned, such road and telegraph were
to be operated as one continuous line.   These ends were to be
attained through the agency of a corporation created by Con-
gress, and of certain corporations organized under state laws
which Congress selected as instruments to be employed in
accomplishing the public objects specified in its legislation.

Naturally, the next inquiry is, whether Congress made any
and if any what provision to secure the United States against
liability on account of its bonds issued in aid of the construc-
tion of this national highway?   The acts of 1862 and 1864
furnish the answer to this question.   By the act of 1862, as
we have seen, it is provided that the issuing of bonds and
their delivery to the railroad company entitled to receive
them should *ipso facto* constitute a mortgage on the whole
line of the railroad and telegraph constructed by the company
receiving the bonds, together with its rolling stock, fixtures
and property of every kind and description, and in considera-
tion of which the bonds were issued; and upon the refusal or
failure of the company to redeem the bonds, or any part of

them, when required so to do by the Secretary of the Treasury in accordance with the act, the railroad, with all the rights, functions, immunities and appurtenances appertaining thereto, and all lands granted to the company, could be taken possession of by that officer, for the use and benefit of the United States. The same act also authorized the government to retain all sums due as compensation for services rendered in its behalf by the railroad company.

These provisions were so far altered by the act of 1864 as to authorize the Union Pacific Railroad Company, or any company authorized to participate in the construction of the road from the Missouri River to the Pacific Ocean, to place a first mortgage on their railroad and telegraph lines, respectively, (to an amount not exceeding the bonds of the United States,) to which mortgage the lien of the United States bonds was made subordinate — saving the right of the government, reserved in the act of 1862, to be preferred in the use of the railroad and telegraph for the transportation of the mails, troops and munitions of war, and the transmission of telegraphic dispatches. The act of 1864 also provided that only one half of the compensation due from the government for services rendered should be retained and applied to the payment of the bonds issued by the United States. But the act of May 7, 1878, c. 96, § 2, known as the Thurman Act, 20 Stat. 56, provided that the whole of such compensation might be retained, one half to be applied to the payment of interest on the bonds issued by the United States, and the other half to be turned into the sinking fund established by that act.

These and other provisions indicate the extent to which Congress deemed it necessary to make provision for the protection of the United States against liability on its bonds loaned to railroad companies for the purposes indicated in the act of 1862. The security taken by the government was, of course, impaired by the act of 1864, which subordinated the lien of the United States, as originally declared, to the first mortgages executed by the respective companies under the authority of that act. But if the act of 1862, fairly interpreted, excludes the idea that stockholders of the companies

receiving subsidy bonds were to be personally liable to the United States for the principal and interest accruing on those bonds, the legislation of 1864, however unwise, did not have the effect of imposing such liability.

Now the important fact disclosed by the Pacific Railroad acts is that no one of them contains any clause imposing upon the stockholders of a corporation receiving subsidy bonds personal responsibility for any debt due to the United States from such corporation by reason of its failure to pay those bonds at maturity. It was, of course, competent for Congress, when incorporating the Union Pacific Railroad Company, to impose such liability upon the stockholders of that corporation. But as it did not do so; as the personal liability of stockholders for the debts of the corporation arises only from statute, it cannot be claimed, nor is it claimed, that the stockholders of *that* corporation incurred by their subscriptions of stock any liability to the United States, or to any other creditor for the debts of that company; they were bound, of course, to make good the amount of their subscriptions; but that being done, their personal responsibility to creditors of the corporate body ceased. *Pollard* v. *Bailey*, 20 Wall. 520, 526; *Terry* v. *Little*, 101 U. S. 216; *Trustees of Free Schools in Andover* v. *Flint*, 13 Met. 539, 541; *Slee* v. *Bloom*, 19 Johns. 456, 474; *Carr* v. *Iglehart*, 3 Ohio St. 458; *Seymour* v. *Sturgess*, 26 N. Y. 134, 139; *Bohn* v. *Brown*, 33 Michigan, 257; *Woods* v. *Wicks*, 7 Lea, 40, 45; *Smith* v. *Huckabee*, 53 Alabama, 191, 193; *Salt Lake City National Bank* v. *Hendrickson*, 40 N. J. Law, 52, 54; *Coffin* v. *Rich*, 45 Maine, 507, 510; 3 Thomps. on Corp. § 2925, and authorities there cited. Congress, by its legislation, encouraged and invited the investment of private capital in the construction of a highway which, at that time, was deemed of vital importance to the whole country. As the stockholder of a corporation is not liable, beyond the amount of his unpaid subscription, for its debts, unless such liability is imposed by statute, and, as the acts of Congress in question are silent upon that subject, every subscriber to the stock of the Union Pacific Railroad Company must be deemed to have become such upon the con-

dition, implied by law, that he should not be personally liable for the debts of the corporation. It is not too much to say that if the acts of 1862 and 1864 had made the stockholders of the corporations therein named personally liable, in proportion to their stock, for the repayment of the principal and interest of the bonds issued and delivered to such corporation, the accomplishing of the objects Congress had in view would have been seriously retarded, if not wholly defeated.

It is said, however, that these principles have no application to stockholders of California corporations that came into existence under constitutional and statutory provisions making a stockholder of a railroad corporation liable, in proportion to his stock, for its debts and obligations.

This position cannot be sustained except upon the theory that Congress intended to take a larger security in respect of that part of the Pacific road which the California company undertook to construct and maintain, than it took in respect of the Union Pacific railroad. But it cannot be inferred from the legislation of Congress that it intended, for the protection of the interests of the United States, to impose a heavier liability upon the stockholders of the California company than was imposed upon the stockholders of the Union Pacific Railroad Company. Why should it have so intended? Why should it be supposed that Congress would purposely make it more difficult to construct one part of the proposed national highway than another? The supreme end sought to be attained was, by means of private capital and governmental aid, to secure the construction of the whole line for the benefit, primarily, of the United States, and for the use of all the people. If, instead of making use of the Central Pacific Railroad Company of California, Congress had itself created a corporation with authority to construct a road from San Francisco through the Territories of the United States, to meet the Union Pacific Railroad Company, no one would suggest that the stockholders of such a corporation would have been liable for its debts, unless Congress expressly imposed liability upon them. In respect of the liability of stockholders to the United States, on account of its subsidy bonds,

we cannot believe that Congress intended to apply to the stockholders of the state corporation, selected to participate in the great work of establishing railroad and telegraphic communication between the Missouri River and the Pacific Ocean, any rule that it did not prescribe for stockholders of a national corporation created for the purpose of accomplishing the same object.

As Congress contemplated the construction of one connected, continuous line from the Missouri River to the Pacific Ocean to be used for governmental and public purposes; as it recognized "the necessity of uniting, by iron bands, the destiny of the Pacific and Atlantic States;" as its enactments disclose an intention to grant national aid to the corporations named, upon terms and conditions applicable alike to all of them, we cannot impute to it the purpose to make a discrimination against one part of that line that would necessarily have retarded the accomplishment of the important public object which it had in view.  Throughout the whole of the acts referred to is manifest the purpose that the California corporation, and other state corporations named, should enjoy the rights, immunities, benefits, and privileges given to them, upon the same terms and conditions as were prescribed for the Union Pacific Railroad Company.  But the imposition of liability upon the stockholders of the California corporation for the debt of that corporation arising out of the bonds it received from the United States, when no such liability was imposed upon the stockholders of the Union Pacific Railroad corporation on account of like bonds received by it, would be inconsistent with that equality in terms and conditions which Congress prescribed for the corporations, that were invited or permitted to participate in the grants, rights, benefits, privileges and immunities granted by the general government to the corporation created by it.

It should be remembered that the question here is not whether the stockholders of the California company can be made liable for its debts to the United States arising in some other way than under the Pacific Railroad Acts and by the acceptance of United States bonds in aid of the construction

of its road.   Nor are we now to decide whether the adoption of the California corporation as an instrument of the national government in accomplishing a national object exempted its stockholders from liability under the constitution and laws of California to ordinary creditors.   The question before us relates only to the liability of the stockholders of the California corporation on account of a claim of the United States arising out of particular acts of Congress which authorized the issuing and delivery of bonds to that corporation, and made such provision for the security of the United States as Congress deemed necessary and proper, but which did not reserve any right to look to the stockholders of that corporation if it failed or refused to meet the obligation imposed upon it in respect of those bonds.

Touching the obligation of the several railroad companies to pay at maturity the bonds received from the United States in aid of the construction of a railroad and telegraph line to the Pacific Ocean, there are cogent reasons, apart from the words of the act of Congress, why a rule should not be applied to the stockholders of the Central Pacific Railroad Company which confessedly cannot be applied to stockholders of the Union Pacific Railroad Company.   Both corporations participated in the execution of the purposes of Congress. Each received franchises and powers from the Federal government to be exerted for objects of national concern.   Although the Central Pacific Railroad Company of California became an artificial being, under the laws of that State, its road owes its existence to the national government;  for, all that was accomplished by the corporation that constructed and owns it was accomplished in the exercise of privileges granted by, and because of the aid derived from, the United States.   "By the act of 1862," this court has said, "Congress granted this corporation a right to build a road from San Francisco, or the navigable waters of the Sacramento River, to the eastern boundary of the State and thence through the Territories of the United States, until it met the road of the Union Pacific Company.   For this purpose all the rights, privileges and franchises were given this company that were granted the

Union Pacific Company, except the franchise of being a corporation, and such others as were merely incident to the organization of the company. The land grants and subsidy bonds to this company were the same in character and quantity as those to the Union Pacific, and the same right of amendment was reserved. Each · of the companies was required to file in the Department of the Interior its acceptance of the conditions imposed before it could become entitled to the benefits conferred by the act. This was promptly done by the Central Pacific Company, and in this way that corporation voluntarily submitted itself to such legislative control by Congress as was reserved under the power of amendment." Again, in the same case : "But for the corporate powers and financial aid granted by Congress it is not probable that the road would have been built." *Sinking Fund cases,* 99 U. S. 700, 727. And in *California* v. *Pacific Railroad Company,* 127 U. S. 1, 38, Mr. Justice Bradley, delivering the opinion of the court, referred to the Pacific Railroad Acts, relating to the Central Pacific Railroad, and said: "Thus, without referring to the other franchises and privileges conferred upon this company, the fundamental franchise was given by the acts of 1862 and the subsequent acts to construct a railroad from the Pacific Ocean across the State of California and the Federal Territories until it should meet the Union Pacific, which it did meet at Ogden in the Territory of Utah." The relations between the California corporation and the State were of no concern to the national government at the time the purpose was formed to establish a great highway across the continent for governmental and public use. Congress chose this existing artificial being as an instrumentality to accomplish national ends, and the relations between the United States and that corporation ought to be determined by the enactments which established those relations; and if those enactments do not expressly nor by implication subject the stockholders of such corporation to liability for its debts, it is to be presumed that Congress intended to waive its right to impose any such liability.

The views we have expressed render it unnecessary to con-

sider any other question in the case. We are of opinion that the bill filed by the United States was properly dismissed, and that the order of the Circuit Court of Appeals affirming such dismissal was correct.

*The judgment is, therefore, affirmed.*