159 U.S. 46 (1895)
WISCONSIN CENTRAL RAILROAD COMPANY
v.
FORSYTHE.
No. 288.
Supreme Court of United States.
Argued March 28, 29, 1895.
Decided June 3, 1895.
ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF WISCONSIN.
*53 Mr. Louis D. Brandeis for plaintiff in error. Mr. Edwin H. Abbot, Mr. Howard Morris, and Mr. William H. Dunbar were on his brief.
Mr. William F. Vilas, by leave of court, for plaintiff in error.
Mr. George G. Greene and Mr. A.B. Browne for defendant in error.
*54 MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.
The land in controversy is within the place limits of the plaintiff's road. Confessedly, therefore, the title passed to the plaintiff, provided the land was subject to the operation of the grant made by the third section of the act of 1864. The contention is that it was not subject thereto by reason of the fact that it was withdrawn by the land department in 1856 and 1859 in order to satisfy the grant made by the act of 1856. It was within the indemnity and not within the place limits of the grant in aid of the Bayfield road.
It is curious to note that in the communication made in 1859 by the land department to the local land officers it is stated that all the unsold lands within the indemnity limits along the line of that road had been selected by the agent of the State in lieu of the lands sold and preëmpted within the place limits. If this selection was in fact made and was needed to satisfy the deficiency in the amount of lands within the place limits, and was approved by the land department, it would avoid the necessity for further inquiry; for whatever of right there was in the St. Croix and Lake Superior Railroad Company passed to the Omaha Company, and was by it, under the agreements of February 12, 1884, and February 19, 1887, transferred to the plaintiff, and this was long anterior to any claim on the part of the defendant.
But assuming, in the absence of any direct evidence thereof, that no such selection was made, we pass to an inquiry as to the respective rights of the parties. The title of the plaintiff, as we have seen, can only be defeated by reason of the land not being within the scope of the grant made by the third section of the act of 1864, and it is only excluded therefrom by the grant of 1856 and the reservation made in pursuance thereof. The reliance of defendant is on the long-established rule, often affirmed by this court and recognized in section six of the act of 1864, to the effect that a grant by Congress does not operate upon lands theretofore reserved for any purpose whatsoever. There can be no doubt as to this rule, or as to *55 the fact that lands withdrawn from sale by the land department are considered as reserved within its terms.
But it is a rule of equal if not higher significance that every act of Congress making a grant is to be treated both as a law and a grant, and the intent of Congress, when ascertained, is to control in the interpretation of the law.
"The solution of these questions depends, of course, upon the construction given to the acts making the grants; and they are to receive such a construction as will carry out the intent of Congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance. To ascertain that intent we must look to the condition of the country when the acts were passed, as well as to the purpose declared on their face, and read all parts of them together." Winona & St. Peter Railroad v. Barney, 113 U.S. 618, 625. See also Missouri, Kansas & Texas Railway v. Kansas Pacific Railway, 97 U.S. 491, 497; United States v. Southern Pacific Railroad, 146 U.S. 570, 597; United States v. Denver & Rio Grande Railway, 150 U.S. 1.
In order to determine the intent of Congress we must look at the situation at the time the act of 1864 was passed. The alternate sections within the six and fifteen-mile limits of the Bayfield road were not granted by the act of 1856. They were simply withdrawn from preëmption and sale by the action of the land department in order that the beneficiary of the grant might, in case the full amount of lands granted was not found within the place limits, select therefrom enough to supply the deficiency. We do not mean that they were not reserved lands; on the contrary, as stated above, they were. Such is the uniform ruling of this court in interpreting like action on the part of the land department. Nevertheless, not being granted lands, they were still within the disposing power of Congress. There would be no question of the title of one to whom Congress had in terms granted them. "Until selection was made the title remained in the government, subject to its disposal at its pleasure." Kansas Pacific Railroad v. Atchion &c. Railroad, 112 U.S. 414, 421; St. Paul & Sioux City Railroad v. Winona & St. Peter Railroad, 112 U.S. 720, *56 732; United States v. McLaughlin, 127 U.S. 428, 450, 455; Wisconsin Central Railroad v. Price County, 133 U.S. 496, 511; United States v. Missouri, Kansas & Texas Railway, 141 U.S. 358, 374.
The land was, therefore, subject to the full control of Congress at the time of the passage of the act of 1864. What did Congress intend by that act? It had in 1856 granted to the State of Wisconsin six sections per mile to aid it in the construction of a road from Madison or Columbus, by way of Portage City, to the St. Croix River or Lake, and thence to the west end of Lake Superior, and to Bayfield, with a proviso that if the road was not completed within ten years the unsold lands should revert to the United States. Wisconsin had accepted this grant, and thus impliedly undertaken to construct the road. It made the La Crosse and Milwaukee Railroad Company the beneficiary of this grant. Subsequently, with the assent of the State, that company had transferred to the St. Croix and Lake Superior Railroad Company so much of the grant as was designed to aid in the construction of that part of the road from the St. Croix River or Lake northward to Lake Superior, with the branch to Bayfield. Eight years had passed, and only two years more remained until the expiration of the time fixed for the completion of the road. Only a short distance had in fact been built, to wit, 61 miles from Portage to Tomah, and that by the St. Croix and Milwaukee company in the spring of 1858. It was evident that the inducement of six sections per mile had not been sufficient to secure the construction of the road in the comparatively uninhabited portions in the northwestern part of the State, and so Congress determined to enlarge its grant in order to secure the accomplishment of the desired end. At the same time it perceived that the public interests required an additional road running through the central portion of the State northward to the two termini on Lake Superior, named for the road from St. Croix Lake or River.
And so it passed the act of 1864. This made a grant to the same grantee, to wit, the State of Wisconsin, but expressed the terms and purposes in three separate sections. *57 Congress evidently knew that at the time two companies had been named by the State of Wisconsin as the parties to construct the road provided for by the act of 1856. So, in the first section, it made a grant of ten sections per mile to aid in the construction of a road from St. Croix River or Lake to the west end of Lake Superior, with a branch to Bayfield; in the second, a grant in substantially like terms for a road from Tomah to the St. Croix River or Lake; and in the third, a grant also of ten sections per mile to aid in the construction of a road from Portage City, Berlin, Doty's Island, or Fond du Lac, as the State should determine, in a northwesterly direction to Bayfield, and then to Superior, on Lake Superior. In each of these three sections it named the State of Wisconsin as the grantee. Although it knew that the State had made two separate companies the beneficiaries of the act of 1856, it made no grant to those companies. It dealt in all three sections with the State, relying upon the State as the party to see that the roads were completed, and to use its own judgment as to the manner of securing such construction. The act of 1864 was, therefore, a mere enlargement of the act of 1856, was made to the same grantee, was in pari materia, and is to be construed accordingly. It is not to be treated as an independent grant to a different party, and, therefore, liable to come in conflict with the rights of the first grantee.
For whose benefit was the withdrawal of the lands within the indemnity limits of the Bayfield road made? Obviously, as often declared, for the benefit of the grantee. It is as though the United States had said to the grantee: we do not know whether, along the line of road, when you finally locate it, there will be six alternate sections free from any preëmption or other claim, and, therefore, so situated that you may take title thereto, and so we will hold from sale or disposal to any one else an additional territory of nine miles on either side that within those nine miles you may select whatever lands may be necessary to make the full quota of six sections per mile. When Congress, by a subsequent act, makes a new and absolute grant to the same *58 grantee of lands thus held by the government for the benefit of such grantee, upon what reasoning can it be said that such grant does not operate upon those lands.?
Kansas City &c. Railroad v. Attorney General, 118 U.S. 682, is in point. On July 26, 1866, 14 Stat. 289, Congress passed an act granting to the State of Kansas five alternate sections per mile to aid the Union Pacific Railroad Company, Southern Branch, in constructing a railroad from Fort Riley, upon the valley of the Neosho River, to the southern line of the State of Kansas. This corporation (its name having been changed to that of the Missouri, Kansas and Texas Railroad Company) constructed the road, and received patents for the land. The object of that suit was to vacate and declare void these patents, and the principal ground relied on for maintaining it was that, by an act of March 3, 1863, 12 Stat. 772, and a supplemental act of July 1, 1864, 13 Stat. 339, the lands had been appropriated to aid another company in building a road along the same line. The act of 1866 had the ordinary reservation clause, similar to that found in section six of the act of 1864 before us, and the contention was that the effect of this reserving clause was to except all the lands covered by the grants of 1863 and 1864 from the operation of the grant of 1866. It was conceded that if the intent of Congress was to aid in the construction of two separate lines of road the contention would have to be sustained, the court saying: "As the lands granted by the prior acts of 1863 and 1864 had, by the act of the legislature of Kansas, been granted to the Atchison, Topeka and Santa Fé Railroad Company, a then existing corporation of that State, for the purpose of building a road, with the same general description as to its course down the valley of the Neosho River, which might have run through these same lands if it had been built by the latter company, it is argued with great earnestness that these lands were necessarily reserved, under this clause of the act of 1866, from the grant, as being reserved by the authority of Congress for the purpose of aiding in that object of internal improvement. If the A., T. & S.F.R.R. Co. had built a line of road along the same general course and through the same lands, twenty miles *59 in width, that the M., K. & T.R.R. Co. has occupied with its road, and asserted a claim to these lands, or to any of them, the argument would be almost irresistible." But it was held, in view of certain arrangements made between the two companies, (not then ratified by the State of Kansas, but expected to be, and, in fact, subsequently so ratified,) that it was the intent of Congress simply to aid in the construction of one road, and that the Missouri, Kansas and Texas Railroad Company was entitled to the full benefit of the three acts. The court thus looked beyond the letter of the statutes to the intent of Congress, and upon that intent denied what would otherwise be a technical ground for relief.
But we need not go outside of this act of 1864 for a clear disclosure of a like intent on the part of Congress. The act of 1856 granted six sections per mile to aid in the construction of a road from St. Croix River or Lake to Bayfield. The lands between the six and fifteen-mile limits of the line of that road as located were withdrawn by the action of the land department. They were thus reserved lands. Now the first section of the act of 1864 granted ten alternate sections to aid in the construction of a road along the same line. Can there be any doubt that this grant of four additional sections operated upon the land thus reserved between the six and fifteen-mile limits? Yet if the act of 1864 is to be taken as making a grant entirely independent from that of 1856, it could not be enforced as to lands between the six and fifteen-mile limits reserved under that prior grant. It will be noticed that the act of 1864 makes no grant directly to the St. Croix and Lake Superior Railroad Company, but only to the State of Wisconsin, and the latter could, if it had seen fit, have made some other company the beneficiary; and yet can there be any doubt that Congress intended by this first section of the act of 1864 merely an enlargement of the grant made by the act of 1856 from six to ten sections, and also intended that as to the four extra sections the grant should operate upon lands reserved between the six and fifteen-mile limits? If this be true as to one part of the grant of 1864, why is it not equally true as to another portion of the grant, all of it being to the same grantee?
*60 When Congress makes a grant of a specific number of sections in aid of any work of internal improvement, it must be assumed that it intends the beneficiary to receive such amount of land, and when it prescribes that those lands shall be alternate sections along the line of the improvement, it is equally clear that the intent is that if possible the beneficiary shall receive those particular sections. So far as railroads are concerned, it is the thought not merely that the general welfare will be subserved by the construction of the road along the lines indicated, but further, that such grant shall not be attended with any pecuniary loss to the United States; for the universal rule is to double the price of even sections within the granted limits. The expectation is that the company receiving the odd sections will take pains to dispose of them to settlers, and thus by their settlement and improvement increase the value of the even sections adjoining and so justify the added price. To fully realize this expected benefit it is essential that the lands taken by the company shall be as near to the line of the road as possible; and so, while selection of remote lands is permitted, it is only when and because there is a necessity of such selection to make good the amount of the grant. Obviously, therefore, an act must be construed to realize, so far as is possible, this intent and to accomplish the desired result.
Still, again, it must be noticed that the State of Wisconsin, the grantee named in both the acts of 1856 and 1864, the plaintiff within whose place limits the land in controversy is situated, and the Omaha company, within whose indemnity limits it is, all three long since agreed that the land passed by this grant, and dealt with it as belonging to the plaintiff. Both roads have been constructed, and, undoubtedly largely through the instrumentality of their construction, population has poured into that part of the State, and the value of all real estate so increased that this particular tract is found by the jury to be worth $8000. After years have passed, and all the parties interested in the matter, other than the United States, have treated it as the property of the plaintiff, the defendant, relying upon a technical construction of the statutes, *61 seeks to enter the tract, and thus, for no more than the paltry sum óf $400, two dollars and a half per acre being the double minimum price of land within the limits of railroad grants, to obtain title to property worth, as we have seen, at least $8000. The railroad company, under this construction, loses the land it supposed it was entitled to, which it has treated as its own, and has helped to make valuable; the government does not receive the $8000, nor indeed anything if the land be entered under the homestead laws, but a stranger comes in, who has done nothing to create that value, and appropriates it to his own benefit. The iniquity of such a result is at least suggestive.
But further, it is urged that this question of title has been determined in the land department adversely to the claim of the plaintiff. This is doubtless true, but it was so determined, not upon any question of fact, but upon a construction of the law; and such matter, as we have repeatedly held, is not concluded by the decision of the land department. Johnson v. Towsley, 13 Wall. 72; Shepley v. Cowan, 91 U.S. 330; Quinby v. Conlan, 104 U.S. 420; Doolan v. Carr, 125 U.S. 618, 624; Lake Superior Ship Canal &c. Co. v. Cunningham, 155 U.S. 354.
Defendant also claims an estoppel by reason of these facts set up as a third defence in his answer, the truth of which was on the trial admitted by the plaintiff. The final decision of the Secretary adversely to the claim of the plaintiff was on or about the 10th day of January, 1890. (The testimony in this case shows that it was made on January, 24, 1890.) Subsequent to that decision the defendant entered upon the premises, built a residence, and made other improvements, at a cost of more than $200. The plaintiff knew of his possession and of the making of such improvements, but took no action until the commencement of this suit, on April 9, 1890. It seems to us that the claim of an estoppel can hardly be seriously made. The plaintiff had been contesting for these lands in the land department for a series of years. Some time after the final decision therein the defendant enters upon the land and commences making improvements, and in making such improvements *62 expends the paltry sum of $200, and the plaintiff fails to file a complaint in ejectment for two months and a half after the decision of the land department, and perhaps, nearly that time after the defendant had entered into possession. Surely the defendant had no reason to believe that the plaintiff had abandoned its claim to the land. Both the time of plaintiff's delay and the amount of his expenditures suggest the rule de minimis non curat lex. The title of $8800 worth of land is not lost in such a way.
For these reasons we are of the opinion that the Circuit Court erred in its decision, and its judgment is, therefore,
Reversed, and a new trial ordered.
MR. JUSTICE HARLAN dissented.
The CHIEF JUSTICE took no part in the consideration and decision of this case.