**RECONSTRUCTION FINANCE CORPORA-TION v. McCORMICK et al. and four other cases.**

**Nos. 6548–6552.**

Circuit Court of Appeals, Seventh Circuit. Feb. 20, 1939.

Rehearing Denied April 1, 1939.

George T. Buckingham, Matthew Mills, Edward R. Johnston, Henry Garner O'Donnell, Benton Atwood, Doval Benjamin Williams, Karl Edwin Seyfarth, Samuel M. Rinaker, Michael F. Gallagher, Arthur R. Hall, Earl B. Wilkinson, Herbert Pope, Edwin J. Nergard, Matthias Concannon, William H. Dillon, R. F. Bostelman, Merritt C. Bragdon, Edward D. McDougal, Jr., Herbert M. Lautmann, David Levinson, A. Fishman, Don M. Peebles, Benjamin V. Becker, Walter E. McCornack, Paul R. Conaghan, George Gillette, John Mann, and S. Sidney Stein, all of Chicago, Ill., for appellants John A. McCormick et al.

Ralph McShaw, Walter E. McCornack, Frank H. Towner, and William C. Mulligan, all of Chicago, Ill., for appellants Robert F. Carr and others.

Franklin J. Stransky, of Chicago, Ill., for appellants 1468 small stockholders.

E. M. Ashcraft, Jr., Carroll J. Lord, and Rufus D. Beach, all of Chicago, Ill., for appellants John F. Jelke, Jr., and others.

O. John Rogge, of Chicago, Ill., Harold Rosenwald, of Washington, D. C., and Floyd M. Rett, of Chicago, Ill. (Claude E. Hamilton, Jr., Gen. Counsel, Clifford J. Durr, Asst. Gen. Counsel, and Hans A. Klagsbrunn, Counsel, Reconstruction Finance Corporation, all of Washington, D. C., and James A. Sprowl, of Chicago, Ill., of counsel), for appellee.

Before EVANS, SPARKS, and TREANOR, Circuit Judges.

EVANS, Circuit Judge.

The Reconstruction Finance Corporation is the plaintiff, and certain stockholders of the Central Republic Trust Company (hereinafter called Central) are the defendants in this suit which resulted in a decree for the plaintiff. Central was also named as defendant. The numerous appeals were consolidated and heard together.

Plaintiff, in this suit, seeks to recover money decrees against stockholders of Central, in amounts equal to the par value of their stock holdings. About one-half of the stockholders have paid a liability similar to that asserted in this suit.

All the defendants deny any and all liability.

Plaintiff's right to bring this suit is traceable to, or grows out of, its loan of $90,000,000 to Central, a state bank organized under the laws of the state of Illinois, with 140,000 shares of stock of $100 par value per share outstanding.

Liability of holders of bank stock is fixed by section 6 of Article 11 of the Constitution of the State of Illinois, Smith-Hurd Stats., and by section 6 of the Illinois Banking Act.

Section 6, Article 11, of the Illinois Constitution reads:

"Every stockholder in a banking corporation or institution shall be individually responsible and liable to its creditors, over and above the amount of stock by him or her held, to an amount equal to his or her respective shares so held, for all its liabilities accruing while he or she remains such stockholder."

Section 6 of the Illinois Banking Act, Sec. 6, Chap. 16½, Smith-Hurd Ill.Stats. Ann., reads:

"Every stockholder in any bank or banking association organized under the provisions of this Act shall be individually responsible and liable to its creditors, over and above the amount of stock by him or her held, to an amount equal to his or her respective shares so held, for all its liabilities accruing while he or she remains such stockholder. * * *"

This statute has frequently been before the Illinois courts.[1]

---

[1] Stockholder's liability is primary, several and individual on the part of each stockholder to each creditor. Golden v. Cervenka, 278 Ill. 409, 116 N.E. 273; Queenan v. Palmer, 117 Ill. 62, 619, 7 N. E. 470, 613; Schalucky v. Field, 124 Ill. 617, 16 N.E. 904, 7 Am.St.Rep. 399; Hughes v. Aubere, 360 Ill. 572, 196 N.E.

The defendants have divided into groups, and these different groups raise different, as well as common, defenses.

The District Court made detailed findings of fact and discussed at length, in a carefully prepared opinion, and in a manner befitting the importance of the case, the various objections of the different groups. The court covered separately and fully all the issues of fact and disputed legal issues which are here presented. Its findings of fact and opinion appear in Reconstruction Finance Corp. v. Central Republic Trust Co., D.C., 17 F.Supp. at page 263. This discussion greatly simplifies our task and shortens this opinion. We refer to Judge Wilkerson's findings and opinion for a complete statement of the material facts, as well as of the legal questions involved.

In fact, we might well adopt both the findings and the opinion as our own, and thus end this opinion. While inclined so to do, we have hesitated because we would not thus fairly meet the criticisms of them, which are set forth in the exhaustive briefs which have been submitted by the various defendants on these appeals. The importance of the case, as well as the earnestness and ability with which counsel have pressed their defenses, is our justification for going into the case so fully.

The issues: Either collectively, or as a group or groups, defendants deny:

1. The R. F. C.'s authority to sue under the Act of its creation;

2. The existence of the necessary creditor status to permit it to maintain an action to collect stockholder's liability;

3. The R. F. C.'s reliance upon the bank stockholder's liability in making the loan without which no recovery may be had;

4. The R. F. C.'s claim of a *single* loan transaction evidenced by an R. F. C. commitment of $90,000,000;

5. The validity of the reorganization and transfer of assets of the Central Republic Trust Company to the City National Bank because not approved by the Illinois auditor under section 15 of the Illinois Banking Act, Ch. 16½, Smith-Hurd Ill.Rev.Stats.;

6. The validation of the reorganization through ratification by the stockholders;

7. The *banking* status of the Central Republic Trust Company when it ceased receiving deposits on October 5;

8. The soundness of plaintiff's differentiation of the case of Continental Illinois National Bank & Trust Co. v. Peoples Trust & Savings Bank, 366 Ill. 366, 9 N. E.2d 53, upon which defendants rely for construction of section 15 of the Illinois Banking Act;

9. The recoverability of loans made *malum prohibitum* by Federal statute, Title 15 U.S.C.A. § 605d, section 207 of the Reconstruction Finance Corporation Act of 1932; and

10. The right of the R. F. C. to apply proceeds from the sale of pledged securities to the last and allegedly void loan ($50,000,000) in preference to the earlier loan ($30,000,000).

To these defenses, one group adds another, a factual defense. They assert that the stockholders were misled into any ratification they may have made in the belief that the reorganization was to relieve them of the threat of double liability and add, there was a fraudulent conspiracy between the R. F. C., and certain officers of the old bank and of the new bank, which resulted in great loss to the old bank and profit to the new and of which conspiracy the stockholders of the old bank were the victims.

From a study of the questions presented for our determination, it is apparent that attacks on certain findings of fact must first be met. Several of the defendants' contentions are predicated upon the assumption that the court's findings of fact are erroneous.

A general fact statement, the correctness of which, we believe, will not be challenged by either side, is herewith attempted. It is made to supply a necessary background to various questions presented to us.

---

811; American Nat. Bank of Mt. Carmel v. Holsen, 331 Ill. 622, 163 N.E. 448; United States v. Freeman, 21 F.Supp. 593, D.C.Mass.; Comstock v. Morgan Park Trust & Sav. Bank, 367 Ill. 276, 11 N.E.2d 394.

Stockholders' liability exists although resort not first had to corporation.

Queenan v. Palmer, 117 Ill. 62, 619, 7 N.E. 470, 613; United States v. Freeman, 21 F.Supp. 593, D.C.Mass.

Stockholders' liability accrues at time liability of bank was incurred. Kingston v. Old Nat. Bank of Centralia, 359 Ill. 192, 194 N.E. 213.

The report of Central on July 25, 1931 showed: loans, $154,000,000; cash, including amounts due from other banks, $63,000,000; deposits, $240,000,000. (Sums less than one million dollars are not given.) Eleven months later the bank loans were reduced to $101,000,000; cash to $18,000,000; and deposits were $128,000,000. The fall in deposits necessitated a reduction in the loans and in cash. In view of the declining security prices in 1932, heavy losses in the sale of securities were unavoidable.

Although the eleven months' record just detailed was discouraging and worrisome, the withdrawals for June, 1932, were paralyzing. From June 1 to June 25, the deposits declined $20,000,000. From June 20 to June 25, the decline was over $13,500,000; on June 25, $4,500,000 was withdrawn.

Charles G. Dawes, formerly active in Central's affairs, became a member of the Board of Directors of plaintiff, February 2, 1932. His resignation on June 6 was effective June 15, 1932. He immediately went to Chicago and played a leading role in the activities of the bank from then on. At 1 A. M., June 27, 1932, he was elected a director. At a special meeting of the Board of Directors at 1:15 A. M., he became Chairman of the Board. Before assuming important government positions to which he was called during the preceding eight years, he had been Central's principal stockholder and its recognized head. Dawes promptly announced that Central would not open its doors the next day. The situation was serious and seemingly hopeless. Only prompt, decisive and bold action could avoid closing and other equally serious consequences. Remaining open was quite as serious and dangerous as closing. What followed in the next twenty-four hours evidenced promptness and decisiveness. The wisdom of its action raises disputatious questions. Even now, years afterwards, when judgment is benefited by a rear view of the facts, unanimity of opinion is absent.

It is unnecessary for us, on this phase of the R. F. C.'s activities, to cast the weight of our opinion, or speculation, upon the scales. The important fact is that action was taken. Financial help came to Dawes and his bank. It came from Washington through the R. F. C., of which Mr. Dawes had a few weeks before been the president. In twenty-four hours a loan of $90,000,000 was arranged. $5,000,000 more was to be advanced by friendly banks of Chicago, who had faith in the integrity of Dawes. $90,000,000 was to be advanced by R. F. C., of which $10,000,000 was to be furnished by the large banks of New York. As the New York banks repudiated their agreement the next day, the R. F. C. had to carry the entire burden and to lend the entire $90,000,000. Preceding the final commitment by plaintiff, negotiations were had to make smaller loans, but all were rejected because it was Dawes' insistence that lesser, or alleviating, loans would result in the full payment to depositors first withdrawing, while those who were faithful and loyal would receive little or nothing.

At the same time, June 27, Central agreed to turn over to plaintiff nearly all of its securities of a face value of $118,000,000 as collateral for the loan. The court found, upon evidence which strongly supported this finding, "that defendant bank would have been obliged to close its doors shortly after June 25, 1932, if it had not been able to obtain the loan on its collateral which was made by plaintiff."

Plaintiff required as a condition of its loan that the borrower obtain a certificate signed by members of the R. F. C.'s local advisory committee, certifying that the proposed loan was adequately secured. The giving of the certificate in this case affords further evidence of the desperate situation which existed in the Chicago banking field. Although no opportunity to make an appraisal of the securities was had, the presidents of two large Chicago banks on the same day, signed the following statement:

"Based upon the information which we have received we believe the proposed loan in the amount of $95,000,000 (Ninety-five Million Dollars) to Central Republic Bank and Trust Company, Chicago, Illinois, of which The Reconstruction Finance Corporation is lending $90,000,000 and others, $5,000,000, to be fully and adequately secured, the security to be of a face or book value of approximately $118,000,000 and including all the assets of the bank."

This statement was as meaningless as it was deceptive and untrue. The loan was far from being adequately secured, a fact well known to both signers.

Following the completion of negotiations, defendant gave its note for $95,000,000, on June 27, 1932. On the same day, it also gave its note for $10,000,000 and immediately received the sum of $10,000,000

therefor. All this occurred between two succeeding sun rises. But it was not all. On the same day the $95,000,000 note was returned. The relevant portions of the minutes are fully set forth in the findings of the District Judge. Their substance is set forth in the margin.[2]

On this same day Central delivered its note for $30,000,000 to the Federal Reserve Bank. On June 29, it was credited with $30,000,000 at the Federal Reserve Bank. On June 29, the Chicago banks advanced to the Central a proportional part of their loan of $5,000,000. Also on June 29, 1932, Central delivered another note for $30,-000,000, and received credit therefor and on the next day this was withdrawn because the United States had overdrawn its account. However, Central paid interest upon said $30,000,000 for one day at the rate of 5½%, the agreed loan rate.

The withdrawal of deposits continued.

By July 13, the total deposits had decreased to about one hundred million dollars. Mr. Owen D. Young on that day appeared before the plaintiff's directors on behalf of the bank and described its difficulties which were increasing. Within a week those directors sent a representative to Chicago to investigate the proposed plan of the new organization. On July 22, the directors approved its loan agency's action in releasing to the bank, collateral of the face value of $20,000,000, which was necessary to keep the bank open and operating. On August 3, officers and directors of the bank appeared before the plaintiff's board and discussed the new organization. On September 23, the bank's president and its attorney appeared before the board and discussed the collateral held by the R. F. C., and assured plaintiff that it would not lose any of its legal rights to proceed against the stockholders of the old bank.

By October 5, the deposits had shrunk to $72,000,000. The total resources had declined to $139,000,000, of which $104,-000,000 was pledged to secure bills payable and rediscounts in the amount of $38,000,000. For the month of August the income was not quite $600,000, and the expenses, $686,-000. The net loss for September, 1932 was over $125,000.

---

[2] The minutes disclose, June 27, 1932:
Gen. Dawes by long distance phone informed the members of the R. F. C. Board that the situation was so serious that unless loans could be arranged the bank could not open the next Monday. Chicago's mayor also pled with the Board. The closing of such a large bank would have national repercussions. The R. F. C. was told the bank needed $95,000,000 to keep open (of which the Chicago banks would furnish $5,000,000) and that the bank would pledge all its assets amounting to $118,000,000 as security and that members of the Chicago Loan Agency would certify the R. F. C. loan would be adequately secured by such collateral. Gen. Dawes assured the Board that the loan was for current deposit requirements and not for purposes of liquidation. Two directors of the R. F. C. reported they unequivocally recommended the loan.

The R. F. C. on June 25, 1932 passed a resolution increasing the $16,000,000 commitment to $90,000,000—the first loan of $30,000,000 to include the $16,000,000, —stating the terms of the note and the collateral and certificate therefor; the $60,000,000 to be disbursed as needed by the applicant, upon named collateral, and agreement involving participating Chicago banks which lent the remainder of the amount needed.

July 15, the minutes of the R. F. C. Board disclosed the following:

Mr. Owen D. Young appeared before the Board, solely because of his friendship for Mr. Dawes, to state the needs of the old bank, stating its increasingly poor financial condition and great overhead, and made the suggestion that a new national bank be formed of about $4,000,-000 capital, and that the new bank would purchase about $20,000,000 of the collateral at face value, thereby diminishing the old bank's loan with the R. F. C. In response to a query of a board member he stated the old stockholders were not to be relieved of liability, but were to be offered an opportunity to secure stock of the new bank on a pro rata basis.

The minutes of the R. F. C. Board on August 4, 1932 disclose the following matters:

The Board received the report of its committee's negotiations with representatives of the Central Republic Bank which report recommended the adoption of the plan for a readjustment of the Bank's affairs on certain conditions in regard to the set up of the new bank and approval by ⅔ of the stockholders of the old bank, and the duties to be performed by the new bank. It was pointed out that control of the old bank lay in the hands of a few stockholders but that the consent of all stockholders to the proposed plan should be secured so that they might not resist a suit to enforce stockholders' liability.

On the afternoon of October 5th, at a special meeting of the bank's directors, Mr. Dawes and others resigned. They had perfected plans for a new bank. They also authorized many matters looking towards an execution of the agreement with the new bank. On that day it sent its note to the R. F. C.'s local agency for $50,000,000, stating its need for the undisbursed balance of the commitment. Pursuant to this, the Federal Reserve Bank in the early morning of October 6, gave to the defendant bank its check for $50,000,000, which was deposited to the old bank's credit, and a check drawn thereon to the new bank. The four participating Chicago banks also fulfilled their commitment.

The situation is summarized in a letter sent out by the old bank to its stockholders:

"The situation became so acute that to maintain adequate protection of depositors, it was necessary to borrow a substantial sum of money. While this restored its favorable cash position of the bank, it imposed a severe burden in the form of interest * * *.

"Drastic reductions had been made in overhead and salaries but the shrinkage in earning assets due, to declining deposits was making it increasingly difficult to meet fixed rental obligations and other charges. * * *

"Every effort was made to devise a plan that would retain intact the business of the bank. A careful analysis, however, of all of the factors involved, and particularly the high fixed rental charges, made it apparent that continued operating losses were inescapable and could only result ultimately in forced liquidation. This would have meant a sacrifice of the assets and would also carry the inherent threat of a stockholders' liability. * * *"

On October 20, notice was given to the stockholders of the old bank of a stockholders' meeting to be held on November 19. The notice stated, *inter alia,* that action was to be taken upon "a proposal to ratify any and all steps heretofore taken by the Board of Directors * * * with respect to the readjustment of its affairs, including the arrangements heretofore made between said corporation * * * (and the new bank) for the assumption by the latter of the deposit liabilities * * * and servicing the activities of the real estate loan and trust departments * * *."

At the meeting of November 19, about 100,000 of 140,000 shares were represented, and by a vote of 98,271 to 280 shares, a resolution was adopted ratifying the bank directorate's action in re the commitment of June 27, and the pledge of the collateral to secure the loans made thereunder; the transaction of October 6, between the old bank and the R. F. C.; the agreement of October 6 between the old and new banks.

■ It is the particular, individual contention of a group of 1468 small stockholders of the old bank that they are not liable because of an alleged fraudulent arrangement which existed between the R. F. C., the Central, its officers and directors and a few favored stockholders, and the same officers and directors acting for the new bank, and the new bank, whereby the R. F. C.'s $50,-000,000 loan of October 6, 1932 was made solely for the benefit of the new bank and not for the sole purpose of the original commitment of June 27th,—to-wit, that of keeping open the old bank.

Their position was and is that these officers and directors, aided by one Owen D. Young, who influenced the R. F. C., actuated by a desire to retain the power, profit and prestige incident to the control of a large metropolitan bank, and to enrich themselves through such control, conspired to accomplish this end and did accomplish it by unloading onto the old bank and its stockholders the debts, obligations and burdens of said old bank while enriching the new bank, its officers, directors and attorneys, by transferring the $50,000,000 received from the R. F. C., as well as some $2,300,000 of other assets, to the new bank. This enabled the new. bank to start its career as a going concern with more than $70,000,000 of deposits and with thousands of the depositors of the old bank,—whose good-will was created by the old bank and was retained by the new, solely through the contribution of the aforesaid $50,000,000 loan made to the old bank and transferred to the new bank.

These stockholders contend that the facts show that Young obtained the consent of the R. F. C. to a modification of the original plan, namely, to permit a new bank to be organized to take over the assets and business of the old bank, leaving the stock liabilities of the old bank unsatisfied and all the intangible assets, such as going value, good-will, etc. transferred to the new bank; that the R. F. C. agreed to this change well knowing the consequences to

the stockholders of the old bank. It loaned the money to the old bank whereupon the stockholders thereof became liable, although it was the plan of the officers of the old bank and the directors of the R. F. C. to immediately transfer the moneys to the new bank. As a consequence the new bank was rid of the burdens and liabilities of the old bank but in possession of all of its valuable assets, and the debts and obligations of the old bank arising out of this loan are now by this action being enforced against the victims of this conspiracy, namely, the stockholders of the old bank.

To further support their position, these stockholders point to the fact that on October 6, 1932, between the hours of seven and eight A. M. the check for $50,000,000 was given to the treasurer of the old bank (who was also the treasurer of the new bank) and he deposited it in the Federal Reserve Bank to the credit of the old bank.

Immediately he drew a check on the old bank and gave it to the new bank, covering the entire amount of the old bank's cash resources including the said $50,000,000. The new bank then delivered to the R. F. C., in accordance with the terms of the tri-partite agreement, a check for over $15,000,000 to redeem some of the old bank's collateral which was pledged with the R. F. C.

These defendants deny that ratification of these acts by the old bank's stockholders at the November, 1932 meeting was made with knowledge of these essential facts.

As against the R. F. C. these stockholders also argue that the October loan of $50,000,000 was a new and separate agreement inasmuch as the June 27th commitment was strictly to maintain the old bank as a going concern. Inasmuch as this loan was knowingly made to help the new bank and to liquidate the old bank and terminate its activities, it was contrary to the powers given to the R. F. C. and the loan was therefore *ultra vires*.

In short, they argue that the mechanics by which the $50,000,000 was passed to the new bank were a sham, or a screen, to conceal the real transactions of the parties; that in fact the loan was to the new bank and liability for its payment should be assumed by the new bank.

It is also argued that as to the $30,000,000 advanced in June, the stockholders' liability is satisfied by the payments that have been made on that loan from realizations on the collateral which was assigned to the R. F. C. to secure this loan, and by the further payment of $15,000,000 made October 6th, which should have been applied on said $30,000,000 note.

Disposing of the special contention of these 1468 stockholders, the District Court made the following finding and conclusion:

"* * * Plaintiff, it is said, knowingly aided this scheme and is barred in equity from proceeding against the stockholders who were thus defrauded. The court finds that the accusation is not sustained by the evidence. * * * In the face of the evidence in this record the charge of fraud and misconduct now aimed at the directors of the bank, and those who aided in the readjustment of its affairs, cannot be sustained."

Our examination of the evidence fails to disclose support for defendants' successful assault on this finding.

The explanation for the change in the plan from that of keeping the old bank open, to that of organizing a new bank is to be found in the words of witnesses and also in the written records. The bank's situation between July and October 6, 1932, changed materially for the worse. The June rate of decline did not continue, but the bank's position grew steadily worse. The deposits dropped from $112,000,000 on June 30, to $72,000,000 on October 5. On October 5, the total resources of the bank were $139,000,000. Its resources were largely pledged to secure bills and rediscounts in the amount of $38,000,000.

Moreover, the operation of the bank was now at a loss; heavy interest charges more than offset the decreased earnings. All securities sold showed a loss. The profit and loss account showed a decline of $500,000 in earnings in four months, and the horizon was black and ominous. It was clear that the old bank could not long continue regardless of the credit and leniency of the R. F. C.

The bank was, by the terms of the agreement with the R. F. C. made June 27, 1932, entitled to an additional loan of $50,000,000.

It was upon this factual situation that the plan was conceived to start a new bank which would be relieved of heavy rentals and other expenses and would be solvent and freed from the large liability which would result when and if the pledg--

ed securities were found inadequate to pay the loans to the R. F. C. The exact day of reckoning might have been uncertain, but there was no uncertainty as to its coming. That the collateral was grossly inadequate to secure the loans must have been well known to all who were familiar with the actual facts.

It is self-evidently true that the new bank was relieving itself of liability. The advantages of starting a new bank with over $70,000,000 of deposits secured without cost cannot be denied. It was likewise securing the good will and going value of an old well-established bank. The going value at the time, however, was represented by a monthly deficit, of earnings over expenses, of several hundred thousand dollars. It is also apparent that in maintaining its good-will, the friendship of its stockholders was, like that of its depositors, invaluable. The new bank's receipt of $50,000,000 was accompanied by its assumption of a liability to the depositors of the old bank.

We are unable to find any evidence upon which we could base a finding that the stockholders of the old bank were prejudiced by the action which followed the creation of the new bank, or the transfer to it from the old bank, of the $50,-000,000, upon the new bank's assumption of liability to the depositors of the old bank.

It was not this transaction that created the stockholders' liability or made a naked statutory liability, a cold reality. That liability existed before this date or transaction. It existed prior to the first loan by the R. F. C. on June 27th.

Instead of the old bank's improving its position after June 27th, it had grown worse. · While the transaction whereby the new bank was created did not improve the position of the stockholders of the old bank, it made their position no worse. In other words, the condition of the old bank was such that the full enforcement of the double liability of the old stockholders had become inevitable before June 27, 1932. It could not increase above that statutory or constitutional limit. Nor was there a chance of reducing it through the closing of the bank, which was the only alternative to the organization of the new one.

Our conclusion is, therefore, that there was no conspiracy. There were no *victims* excepting the R. F. C. of whose generous action in lending this large sum without adequate security, the stockholders cannot complain. The reflection which the charges make upon those in control of the bank, while of secondary importance, is likewise unwarranted by the fact. The loan from the R. F. C. provided the only possible chance the bank had of surviving and ultimately avoiding the stockholders' liability. It, at least, gave them a breathing spell and sorely-needed time to realize the largest possible amounts from the collateral held by the R. F. C.

As to the hasty and ill-advised action of the R. F. C. in lending such large sums of money without adequate security and without full investigation, all within a few hours and apparently without the approval of the members of its board, we find no excuse or justification. Of that action, however, the stockholders should be the last to complain. They were the beneficiaries, not the victims, of this favoritism.

Another fact issue, the determination of which is necessary to an approach to the legal questions involved, may be stated thus: Was the R. F. C.'s $50,000,000 advancement on October 6 to the new bank or to the old bank? Was it a part of the June 27th loan transaction of $90,000,000 or was it a separate loan made October 6, 1932?

The exact transactions whereby this money was advanced and the note given are covered by the court's finding, and support for such finding is not in serious dispute.

On October 5, Central sent its note for $50,000,000, bearing date of October 6, to plaintiff, and an accompanying letter stating its need for the sum of $50,000,000 "being the undisbursed balance of the commitment of the R. F. C. to the undersigned." The ultimate direction of the plaintiff was found in these words:

"Referring to our letters to Federal Reserve Bank of Chicago, of September 28, and September 29, 1932, we hereby advise you that we have need of the sum of Fifty Million Dollars ($50,000,000), being the undisbursed balance of the commitment of Reconstruction Finance Corporation to the undersigned.

"We therefore are herewith handing to you our new note payable to the order of Reconstruction Finance Corporation, dated October 6, 1932, maturing December 24, 1932, in the principal amount of Fifty

Million Dollars ($50,000,000) bearing interest at the rate of five and one-half per centum per annum payable at maturity.

"Will you arrange to credit our account at the Federal Reserve Bank of Chicago with the sum of Fifty Million Dollars ($50,000,000), representing the proceeds of said note, on October 6, 1932."

On October 5, 1932, plaintiff's loan agency sent a letter which stated:

"An original disbursement of $10,000,000.00 was made on June 27, 1932, and a supplemental disbursement of $30,000,000.00 was made on June 29, 1932. In keeping with the authority contained in the Board's Resolution, as set out in Leach's telegraphic advice of approval, you are authorized to advance an additional $50,000,000 as per directions of the applicant."

On October 6, 1932, early in the morning, the Federal Reserve Bank gave to Central its check for $50,000,000. This check was immediately endorsed and deposited to the credit of Central.

On the same day the Chicago banks, which had agreed to lend $5,000,000 and had advanced only a part of it, now gave Central $2,777,777.78. These advances were all by checks and drafts. Uncertainty as to dates and names of payees, etc., is therefore not present.

The new bank opened its doors for business October 6, 1932, and assumed all unsecured depositors' liabilities of the old bank. They aggregated $72,330,629. Central transferred the money obtained from the other Chicago banks and from the R. F. C., as well as other assets, to the new bank which in addition to assuming the old bank's liability to its depositors, purchased from the R. F. C. certain securities amounting to $15,000,000, for which plaintiff credited the $50,000,000 loan.

The court found, and the facts clearly disclosed, that "none of the funds disbursed by plaintiff or the four Chicago banks was used to furnish capital or surplus" to the new bank.

The intention of the parties seems to be clear. The amount of the loan from plaintiff and the Chicago banks on June 27 was $95,000,000. The collateral which the bank was to give to secure both loans consisted of practically all of its assets. The $95,000,000 loan was made in order to pay *in full* all of Central's depositors. However, not all of the proceeds of the entire $95,000,000 loan were needed at once. The

plan was to keep Central open and a going concern so that with an increase of security prices and a return of deposits Central would never require the entire $95,000,000.

The size of the loan, however, is shown by the notes executed by Central on June 27 and June 29. They were for the full amount of $90,000,000 to R. F. C.

The changes in the size of the notes were undoubtedly due to the cash demands of Central.

Likewise, both parties recognized on October 5, Central's right to call for the unadvanced portion of the loan, to-wit, $50,000,000. Central so asserted its right and the R. F. C. admitted it in writing. The check from the R. F. C., as well as the drafts from the Chicago banks, named Central as payee. Upon such evidence it is impossible to find that the new bank and not the old bank was the borrower of this $50,000,000. Moreover, it is clear that the loan was actually made June 27, but the cash advancements which the loan represented were made at different times as the borrower's demands necessitated.

It may well be inferred that the R. F. C. knew that the money would be turned over by Central to the new bank. For the purpose of this argument, we assume such to be the fact. This did not, however, change the important fact that the loan was made by R. F. C. to *Central*.

Had the R. F. C. drawn 5000 checks of $10,000 each, knowing full well that the payee was going to deliver such checks to its depositors and the amounts were fixed with that purpose in mind, it could not be successfully argued that loans were thereby made by R. F. C. to said depositors. The loan would still be the obligation of Central, and it would not be a loan to the depositors.

Whether the $50,000,000 loan was, in legal effect, made June 27 instead of October 6, is a more debatable question. Undoubtedly, it was the intention of the parties to complete negotiations for the loan, on June 27th.

The R. F. C. assumed that a commitment of $90,000,000 was binding upon it. This is evident from its letters. Central was evidently convinced that it had a right to the entire amount upon its demand. This is apparent both from its written word, as well as from the insistence upon a commitment of $90,000,000 before Mr. Dawes would agree to open the bank. If the ad-

vancement of any part of the amount were optional, then that which he so insistently fought for, namely, full protection of all his bank's depositors, would not have been secured.

Equally persuasive of the exact agreement of the parties is the action of the other Chicago banks in carrying out their June 27th agreement.

It is fair to assume that on October 6, 1932, these banks were not making gifts or donations of nearly three million dollars to a competitor. The anxiety of the period are matters of which we may well take judicial notice. And the banks, of all commercial institutions, were suffering the most acutely. They were if comparisons be permitted, the most apprehensive. The repudiation by the New York banks of their solemn verbal commitment of ten million of the ninety million dollar loan is persuasive evidence of the conditions and the spirit of the times.

Yet the Chicago banks on October 6, completed their commitment,—complied with the terms of the agreement which they made June 27th. They did so because of their agreement of an earlier date and notwithstanding the pressing needs and solemn warnings existing on October sixth. This action on their part supplies most persuasive proof that the June 27, 1932 agreement was binding on the plaintiff as well as upon the other Chicago banks, and that it was a single loan agreement the terms of which called for the advancement of money as the borrower needed it, but not exceeding $95,000,000.

All of the defendants jointly, and some of them separately, argue that the plaintiff should have applied all sums realized from sales of collateral securities on the $30,000,000 indebtedness. Plaintiff admits that had all such sums been so applied that note would have been fully paid.

There were certain stockholders who disposed of their stock between June 27 and October 5, 1932. They, in particular, demand the application of all sums realized from the sale of securities on the first, the $30,000,000 note.

It is elementary that in the absence of agreement and in the absence of direction from the borrower, the creditor may apply payments to any obligation he holds. Equally clear, if there be no provision to the contrary, the debtor may designate the application of payment and the creditor must comply with such direction. In case there is a specific agreement covering application of payments on debts, it governs.

The first paragraph of the $30,000,-000 note provides that it stand as security "for the debts due or to become due heretofore or hereafter contracted or existing." Another part of the same note contained the following provision,

" * * * And in case of such collection or conversion into money of such collateral or part thereof, the Payee or holder, after first deducting the costs, attorneys' fees and expenses of collection, shall apply the balance of such proceeds to the payment of this note or any other indebtedness of the undersigned whether due or not in such manner as it shall choose."

In construing this contract, if inconsistency or ambiguity existed, we would look to all of the provisions of the agreement and draw therefrom the intent and agreement of the parties. However, there is no inconsistency and no ambiguity. The payee was authorized to apply the balance after payment of costs, attorneys' fees, and expenses of collection to the payment of the $30,000,000 note or *any other indebtedness* of the maker. It was the payee, not the maker, who had the right to make the application. And it could apply the same on the $30,000,000 note "or any other indebtedness of the maker." Words could hardly be clearer or more specific.

Even had the contract not so provided, the maker in this instance acquiesced in the applications.

Defendants, however, argue that as stockholders they were third parties and the action of Central could not bind them. We think otherwise. The stockholders of a corporation are bound by the legitimate action of said corporation. The debt was the corporation's debt. Its sanction of the application by the plaintiff bound the stockholders.

It is likewise apparent that if this matter were not controlled by the action of the parties or their agreement but rested with the court to make the application after suit was begun, it could not in fairness have directed all payments to be applied on the $30,000,000 note. There would, if the court were making the applications, have been pro rata payments adopted. In other words, realizations would be applied upon the various notes in proportion to original amounts. Had such a practice

been followed there would have been left on the $30,000,000 note an unpaid balance in excess of the amount of the total liability of the defendants herein.

Defendants generally, and a group in particular, argue that the R. F. C. Act confers no authority upon the R. F. C. to recover from stockholders of the borrowing corporation amounts loaned to said corporation; that in its strict and correct sense the R. F. C. was not a creditor of Central within the meaning and intent of the Constitution of Illinois, and that the opinions of the Supreme Court in United States v. Stanford, 161 U.S. 412, 16 S.Ct. 576, 40 L.Ed. 751, and United States v. Guaranty Trust Co., 280 U.S. 478, 50 S.Ct. 212, 74 L.Ed. 556, necessitate our rejection of the plaintiff's asserted claim based on a stockholder's statutory liability.

This argument presents the most serious attack, which defendants have advanced, upon the soundness of the District Court's opinion.

Contending that plaintiff in order to recover must qualify (a) as a creditor of Central within the meaning and intent of the Constitution of Illinois; (b) that plaintiff is not a commercial organization having general corporate power, but '(c) is the special agency of the Government created for a specific purpose and possessing only those powers granted to it by the statute creating it; (d) that a study of the language of the R. F. C. Act, and of its debate by Congress demonstrates that plaintiff was not authorized, or intended to have, authority, to enforce bank stockholders' liabilities even though state statutes authorized such recovery by other creditors, and (e) that the plaintiff's rights and authority as defined and prescribed by the R. F. C. Act may not be enlarged by the application of the Illinois law, either to effect or defeat the purpose of the national legislation—these defendants rest their case on this phase of the argument.

It may be, and we believe must be, conceded that propositions (a), (b), and (c) in the foregoing enumeration are sound. They are accepted. With this concession the issue is narrowed and there is necessitated a study of the Act itself and particularly Section 5, thereof, 15 U.S.C.A. § 605. Defendants have asked us to read and study it in the light of its history and of the Congressional discussion which occurred immediately preceding its passage.

Stripping the statute of the words unnecessary to a consideration of our question, it reads as follows:

"To aid in financing agriculture, commerce, and industry, * * * the Corporation is authorized and empowered to make loans, upon such terms and conditions not inconsistent with this act [chapter] *as it may determine,* to any bank * * organized under the laws of any State or of the United States, including loans secured by the assets of any bank * * * that is closed, or in process of liquidation to aid in the reorganization or liquidation of such bank. * * * All loans made under the foregoing provisions shall be *fully and adequately secured.* The corporation, under such conditions as it shall prescribe, may take over or provide for the administration and liquidation of any collateral accepted by it as security for such loans."

While we have read the quotations from the debates in Congress and other historical matter, we have not found them either controlling or influential in the determination of the precise question here presented.

There is no reference to the inclusion of stockholders' liability, as such, in the Congressional debates. The most that can be said is, that this matter was not specifically included nor was it expressly excluded. The record is silent thereon.

■ Moreover, such argument would have no weight and no place in the construction of a statute which is unambiguous. No ambiguity is suggested in any of the sentences of Section 5.

The grant of authority to plaintiff is expressed in comprehensive terms. First, loans may be made to aid "in financing agriculture, commerce, and industry." More comprehensive words could hardly have been chosen. The Act gives express authority to make loans to any bank. Not only may the loans be made to a bank, but special provision is made for loans to banks which are closed or in the process of liquidation and to aid in their reorganization or liquidation. In fact, it is not at all unlikely that the Act contemplated aid to agriculture, commerce and industry largely through loans to banks.

■ In the absence of limitations to the contrary a corporation organized to lend money and which has authority to lend for

certain purposes, may prescribe or define the amount and kind of security which must be given.

A loan contemplates the ultimate return of the moneys lent. If not, the advance had better be called a gift. Common practice is to exact security to insure the repayment of loans. Authority to exact and take security is implied from the grant of authority to make a loan. If restrictions upon the power of the corporation to lend or take security for authorized loans are asserted, those limitations must expressly appear. They are not to be implied, for of necessity they are somewhat inconsistent with a grant of power to lend money.

There are no limitations upon the power of plaintiff to make loans, save one—the loan shall not "be inconsistent with this Act."

Express authority to take security instead of being a limitation upon its power to include all forms of security, implies the contrary. The Act provides that the plaintiff may make the loan upon such terms and conditions not inconsistent with this Act *"as it may determine."*

The provision that "all loans made under the foregoing provisions shall be fully and adequately *secured"* is stressed by defendants, it being insisted that Congress here intended to accomplish two things: (a) to avoid loss because of inadequately secured loans, and (b) to limit the lender to securities commonly termed collateral, such as notes, bonds, mortgage bonds, stocks, etc. It is their position that this section, with the word "secured" so defined, is exclusive.

We do not so construe this sentence. It was not intended, as we view it, to be a restrictive sentence or a limitation on the power of plaintiff to lend money or to secure its loan. It was an admonition to the officers of the plaintiff to avoid loss, by adequately securing its loans—an admonition which would have profited plaintiff much had it been followed in this instance.

For Congress to direct the officers of the R. F. C. to fully protect its loans is not without some precedent. Unfortunately when the command is in general language, its effectiveness is dependent upon the integrity and the capacity of the officers who execute it. Analogous situations arise where trust companies investing trust funds are directed to take securities of a particular kind only and sometimes a ratio of loans to value of securities is prescribed. The spirit of such direction and the intent back of those who insert it in the statute, trust deed, or other instrument are inconsistent with an asserted purpose to restrict loans or kinds of security. Rather does legislation which calls for the taking of adequate security to protect a loan suggest that avoidance of loss was the object of its insertion. It seems rather farfetched and inconsistent to assume that Congress, being desirous of securing its loans by directing the officers of plaintiff to fully secure them, was thereby taking from its said agency a class of security which the laws of the state or Nation gave to it.

The direction and authority to loan money to distressed banks were obviously for three purposes: (a) To help the depositors; (b) to keep the bank (which is a valuable instrumentality in commerce) afloat; (c) to avoid losses to the stockholders of the bank which in most states of the Union meant not only the loss of the original sum invested in the bank stock, but a liability equal in amount to the par value of said stock. To be perfectly frank it should be added that as a rule the stockholders are also the bank's most substantial depositors.

The possibilities of aid to all three groups, but particularly to the stockholders of the bank, would be lessened if the plaintiff were denied the right to enforce the stockholders' liability. In cases where plaintiff made the loan to aid a bank in reorganizing or stabilizing, the double liability of the stockholder had already attached. It could be enforced by the depositors and other creditors of the bank at the time the loan was made. In short, it was an accrued, existing liability. It was so in the case of the stockholders here involved. No reasonable construction of the command or direction to adequately secure the loan should require the surrender of an existing stockholder's liability.

Likewise, in many instances, the amount of the loan, because of the inadequacy of the collateral security, would have been futile without reliance on stockholders' liability. Plaintiff was authorized to lend money to banks. Ordinarily in Illinois and in most states upon the loan's being completed, the bank was liable therefor, and the stockholders were also liable to

the amount of their stock. No words were necessary to create the debt or the stockholders' liability.

Immediately upon the default of the bank the stockholders' liability was enforceable by direct action. Burket v. Reliance Bank & Trust Co., 367 Ill. 196, 11 N.E.2d 6.

To avoid this liability, which in Illinois is traceable not merely to statute but to a provision of its Constitution, the stockholder must point to act or contract which shows nonliability. The inferences and deductions are all to the contrary. It is not to be presumed in the absence of an express prohibition that courts should place restrictions on grants of power made to corporations which would render less effective the grant of authority. The statute calls for a construction which would effectuate, not defeat the purpose of the enactment, which was the extending of credit to distressed banks.

Defendants, however, rely confidently upon the two decisions above cited, the Stanford case being cited with much confidence. The decision is lengthy and contains expressions which apparently furnish comfort to both sides.

It denied to the United States, the lender in that case, the right to enforce a stockholder's double liability created by California law. However, the facts in that case are peculiar and are distinguishable in some respects from the one before us. In both cases it must be conceded that the terms of the loan govern, and the language of the statute is determinative. In the Stanford case, there was but one loan contemplated. The object of the advance was to obtain transcontinental railroad transportation. The Government was persuaded that its aid to the project was necessary. In a sense it may be said of that case—the Government and the railroads undertook a joint venture—the construction of a "connected, continuous line of railroad from the Missouri river to the Pacific Ocean, to be used for governmental and public purposes." 161 U.S. page 431, 16 S.Ct. page 583.

The debt to the Government was specifically secured by the terms of the loan. In fact, its loan was a mortgage on the railroad. Probably most important in the determination of the question of double liability was the provision for uniformity of treatment of all debtor corporations.

There was stockholders' double liability in the case of only one of the several railroads' contracting with the Government. Giving all of these factors their due weight the court held that it was not the intention of the parties to include stockholder's liability as part of the Government's securities.

In the case before us, as has been pointed out, the opposite inferences are fairly deducible. The R. F. C. Act contemplated a multitude of different loans. The Act of 1862, 12 Stat. 489, dealt with a single advancement and that in a sort of a joint venture where the lender was well nigh a partner with the borrower. The advantages to the plaintiff were not the same. The borrowers from the R. F. C. were to be as many and varied as the crying need of a country in the depths of a desperate, despairing depression would require. The only admonition which the Congress saw fit to impose was to obtain adequate security.

In the R. F. C. Act the Government created an agency to lend moneys to distressed commercial enterprises. Loans, not gifts, were to be the business of this agency. Two billion dollars were to be loaned, interest collected, and the principal repaid. The R. F. C. was the instrumentality to carry out these activities.

In the Act of 1862 which provided for grants to railroads, the single object of the legislation was to help in the building of a transcontinental railroad system. Gifts were made. Stupendous land grants characterized the legislation. Bonds were given (in a sense they were miscalled *loans* rather than *gifts)* and the terms of the security for the return of these bonds (the question in issue) were specifically and quite elaborately covered by the Joint Enterprise Agreement. Stockholders' liabilities were not included. The inclusion would have been repugnant to provisions covering advancements to railroads organized in other states.

The R. F. C. Act did not define the kinds of security which might be accepted because it was impractical, if not impossible, so to do. The securities which the borrowers might offer would be as varied as the myriads of investments in the many industries with which plaintiff was to deal. As a result Congress dealt with the subject matter of securities in one sentence which contained a direction in the nature of an admonition—that loans should be

adequately secured. In the common parlance of men engaged in lending money, this probably was an injunction to get all the security possible. The most adequate security is at best a relative term, but it is suggestive of inclusion. It would never be construed as excluding or leaving out part of obtainable securities.

In the final analysis, determination of this perplexing question, not entirely free of legitimate doubt, must be this: The defendants' position is inconsistent with the purpose and the goal of the R. F. C. Act; its adoption would impair and handicap plaintiff in making loans to distressed debtors. Elimination of stockholders' liability from assets which constitute the security of a loan, would necessarily result either in changing the length of the loan, or the amount advanced, or prevent plaintiff from extending leniency to the borrower, which would be of invaluable benefit to the debtor. Viewed practically, the success of the venture represented by the R. F. C. Act was dependent in a large measure upon two things: The amounts advanced and the period of time which the banks would have within which to dispose of their frozen assets. Both of these depended on the kind and extent of securities which the bank could offer.

Our conclusion is that the R. F. C. Act contemplated the inclusion—not the exclusion—of bank stockholders' liabilities as part of assets covered by the lien of Government loans.

█ All defendants unite in denying liability because of the decision in Continental Illinois Bank & Trust Co. v. Peoples Trust & Savings Bank, 366 Ill. 366, 9 N. E.2d 53, 57. This holding, like the decision of the United States Supreme Court in the Stanford case, is not only most important, but is one over which embattled counsel find themselves unable to agree even on a starting point.

As in the Stanford case, our duty is to accept the law as announced and not concern ourselves over the soundness or persuasiveness of the reasons which support it. The Illinois Supreme Court decision in the Peoples Trust & Savings Bank case is controlling as to the questions there decided. As to soundness of the reasons back of the decisions we are, of necessity, noncommittal.

Defendants here charge that the $50,-000,000 loan by plaintiff (the October 6th loan) was to liquidate Central and to transfer its assets to City National which would assume Central's obligations to depositors, and being without the knowledge, consent, or approval of the State Auditor of Public Accounts of Illinois, was an evasion and a violation of the banking laws of Illinois and violative of the public policy of said state. Further, the defendants argue that the Illinois banking laws afford the exclusive statutory method of liquidation of Illinois state banks. Sec. 15, Ch. 16½, Smith-Hurd Ill.Stat.Ann.[3]

And defendants finally conclude that having actually participated in a scheme to evade and violate the banking laws, the plaintiff cannot now invoke the Illinois statute or organic law to enforce the bank stockholders' liability.

The applicability of this decision turns upon the facts of our case. We must accept those set forth in the findings, unless defendants can show necessity for their modification.

The decision in the Peoples Trust case is the storm center around which the plaintiff and the defendants attack and defend. A study of its facts (ignoring the conclusion for a moment) at once emphasizes the vital differences between it and the instant case.

Some of these differences are: In the Peoples Trust case the creditor, seeking to enforce the stockholders' liability, was a party to the agreement under fire—the alleged liquidating agreement. In the instant case, the plaintiff was not a party to the agreement between Central and the

---

[3] Section 15, Chap. 16½, Smith-Hurd Ill.Stats.Ann.:

"Any association organized under this Act or any corporation with banking powers organized in pursuance of any general or special law of this State, * * * on depositing with the Auditor an amount of money equal to the whole amount of debts and demands against it, * * * or upon making a contract in writing, approved by the Auditor, by which another bank or banking association incorporated under the laws of this State or of the United States assumes the whole amount of debts and demands against it, an executed copy of which contract shall be deposited with the Auditor, may determine its affairs, distribute its assets among its stockholders, resign its charter or certificate of incorporation, and close up its business, by a resolution passed at a meeting of its stockholders called for such purpose."

320

new bank. It may have known of such an agreement (and even approved), and we find that it did, but that did not make. it a party thereto nor liable as a party.

Secondly, the agreement between the two banks in the Illinois case was in fact and in legal effect a liquidation agreement. It contemplated, and its execution necessitated, a liquidation of Peoples Trust and Savings Bank. The agreement did not provide for the approval of the Illinois Auditor of Public Accounts and therefore as a liquidating contract it was void. No similarity is found in the terms of the agreement in the instant case.

In the case at bar the contract between Central and the new bank (*to which plaintiff was not a party*) was not necessarily a liquidating agreement. By it, the parties did not dispose of *all* of Central's assets nor take care of *all* of its liabilities. In the Illinois case the Supreme Court said:

"* * * No one can read this agreement without reaching the conclusion that it was the intention of both banks to include all of the liabilities of the Peoples Bank, * * *. The contract stripped the Peoples Bank of every vestige of property it had and of every power bestowed upon it as a banking corporation. It was left with no means of ever paying the debt or any interest on it. It had no way of making a dollar. Although it did not surrender its charter and was not technically dissolved, that fact is immaterial. It could not have done so without first satisfying all its obligations. It was completely and forever out of business and the argument that the whole of its liabilities was not, in fact, assumed, can avail nothing in this case."

In the instant case there was $70,000,-000 of indebtedness outstanding not covered by the agreement. Central retained and did not transfer to the new bank its equity in securities, the face value of which exceeded $70,000,000. There were other debts of much smaller amounts and other rights (in the nature of property rights) which were reserved by Central.

Defendants' counsel insist that we should look to the substance, the actualities, and not accept straw men nor refined distinctions existing only in theories and based on fanciful conjectures as to the future. As an example, it points to the securities delivered to plaintiff in which an equity of redemption was retained by

Central. They were not worth half the $70,000,000 of indebtedness which they secured. In short, Central was dead, even though not buried.

Vigorously, it is asserted there existed a legal but no factual basis for the assertion that Central retained part of its assets, and therefore liquidation was neither the goal nor the effect of the agreement between Central and the new bank. A rather persuasive argument is this. But, what of Central's obligations? We find no lack of substance or reality as to them. Notes amounting to over $60,000,000 which were unqualified, and which bound Central to pay them in the near future, afford rather persuasive evidence of their realty and substantiality.

The new bank did not assume the debts represented by these notes. With no provision for its dissolution or demise, with securities in which it held the legal equity having a face value of over $70,000,000, and a market value of about one-third of that sum, with unpaid debts outstanding which exceeded $70,000,000, there is disclosed a situation vastly different from that which the Illinois Supreme Court considered in the Peoples Trust case. There, all liabilities of Peoples Trust were assumed by Continental and the relation and size of the two banks made that agreement readily effective and fully enforcible. Thus, with all liabilities extinguished and all assets transferred by Peoples Trust to Continental, a vitally different fact situation is disclosed. The differences are vital. They are determinative of the character of the two agreements.

In the instant case the possibilities of Central's ever paying its obligations from the assets which were deposited as collateral were no doubt extremely remote. They were not, however, entirely beyond the range of hopes. In fact, the rise in values of said securities in the year 1933 is an illustration of how quickly a malist may become a bonist.

In other words, changes in market values are such that they afford the basis of a sharp contrariety of opinion. In the world of finance there are, as of old, many prophets. They may be unhonored, save away from home. They tell us of to-morrow's price trends with confidence born of past successes or forgetful of past predictions unrealized. But the power of such prophecy dwells not with courts. Whether notes held by plaintiff will ultimately be

paid out of securities which Central turned over to secure its loan, we do not know, and over such possibilities we may not judicially speculate.

Ours is the task of ascertaining whether an agreement is a liquidating one when it appears that the party which is to be liquidated retains its corporate charter, continues to owe $70,000,000 of debts which are not assumed by anyone, and retains assets the face value of which exceed its debts by several millions of dollars.

Our conclusion is that liquidation was not shown, and the agreement here under consideration between Central and the new bank falls outside the Peoples Trust decision.

██ All defendants rely on section 207 of the Emergency Relief & Construction Act, approved July 21, 1932, Title 15, U. S.C.A. § 605d, which reads:

"No loan or advance shall be approved under this chapter, directly or indirectly, to any financial institution any officer or director of which is a member of the board of directors of the Reconstruction Finance Corporation or has been such a member within the twelve months preceding the approval of the loan or advance."

They argue: Mr. Dawes was a member of plaintiff's Board of Directors until June 15; he became chairman of the Board of Central, June 27th and continued in said position until after October 6th, at which date the $50,000,000 was advanced. Wherefore it is urged that said loan of $50,000,-000 clearly and expressly violated the prohibitions of section 207, and was and is unenforcible against defendants.

Plaintiff denies that the advance of $50,000,000 on October 6th violated section 207, because the loan from the R. F. C. to Central was made before section 207 was enacted; that section 207 only applied to loans made after its passage; and finally, even though section 207 were violated, the loan was enforcible. It points out that section 207 does not deal with the validity of a loan made in violation of its terms, but attempts to prevent the evils of favoritism by the officers of the R. F. C.

We accept and approve the vigorous condemnation of violations of this section 207 which defendants' counsel indignantly voice. They say with vehemence that the practice is against public policy and, as shown in the instant case, promotes favoritism, and favoritism leads to the making of loans inadequately secured, and finally such transactions are provocative of loud and just complaints from other banks in distress, which were denied government assistance.

Defendants might go one step further and say, in the absence of any statute condemning the practice, the standard of ethics there announced should govern the action of public officials who bear the responsibility of representing the Government in its loan dealings with hard-pressed banks. Only by applying such a rule may respect be inspired in the citizenry.

Notwithstanding the expression of these wholesome sentiments, there remain the unsettled legal questions: (a) Were the loans when made, in violation of this section? (b) If so, were they *malum in se, —contra bones mores*, void *ab initio*, unenforcible?

The issue raises arguments pro and con which we need only state. Plaintiff's position is that refusal to enforce a loan made in violation of section 207 would punish the innocent and enrich the wrongdoer. It argues that if A and B contracted in violation of A's powers, B who benefited by the contract should not be permitted to plead A's excess of power to contract in order to avoid the payment of money by B received.

Defendants argue that a contract made in violation of a statute which unmistakably defines the public policy of the Government, is void *ab initio*. It is not voidable but void. Its enforcement is possible only at the sacrifice of a sound principle of public policy solemnly pronounced in the enactment of a public statute.

As a matter of fact both parties are in a better ethical position than a statement of the naked question suggests. Defendants (save Central) were not parties to the transaction. They are stockholders resisting stockholders' double liability, a sort of a punitive liability. As to plaintiff, it may be said it believed it was carrying out commitments which were made before section 207 was enacted. It was meeting its valid agreement previously negotiated.

The District Court found that the loan was made prior to the enactment of section 207. This, alone, would defeat its application. But we rest our decision on an additional ground.

██ We find judicial precedents in somewhat analogous statutes. The National

Bank Act, 12 U.S.C.A. § 21 et seq., prohibited loans upon real estate securities. Notwithstanding the statutory prohibition the courts held the loans in violation thereof were enforcible. Union National Bank v. Matthews, 98 U.S. 621, 25 L.Ed. 188; National Bank v. Whitney, 103 U.S. 99, 26 L.Ed. 443; Union Gold-Mining Co. v. National Bank, 96 U.S. 640, 24 L.Ed. 648.

Likewise, it was held that where a corporation borrowed in excess of a limit prescribed by statute, the validity and enforcibility of the loan were not thereby impaired. Sioux City Terminal R. R. Co. v. N. A. Trust Co., 173 U.S. 99, 19 S.Ct. 341, 43 L.Ed. 628.

Also it was held that a national bank, though prohibited from making loans upon the security of its own stock, may nevertheless enforce loans made with bank stock the sole security. First National Bank of Zenia v. Stewart, 107 U.S. 676, 2 S.Ct. 778, 27 L.Ed. 592.

See also, Thompson v. St. Nicholas National Bank, 146 U.S. 240, 13 S.Ct. 66, 36 L.Ed. 956; Bowditch v. New England Mutual Life Insurance Company, 141 Mass. 292, 4 N.E. 798, 55 Am.Rep. 474.

The rule which runs through all of these decisions is this,—Contracts made in violation of prohibitions of statutes similar to section 207 are not void. Such provisions are intended merely to be directory to the officers or persons to whom they are addressed, and are not conditions precedent to the validity of the loan. It is the purpose of such statute to protect a corporation from the dishonesty and self-interest of its officers—a shield to the corporation. To permit those who are benefited through the violation of the statute to avoid their loan obligations would not only defeat the main purpose of the enactment, but would visit the consequences of the unlawful acts of officers not on themselves but on the plaintiff for whose protection the statute was made. The test usually applied is this—Does the statute in addition to prohibiting action by corporate officers, declare the contract negotiated in violation of said prohibition, to be null and void?

In conclusion it might not be amiss to make a few observations which express the passing impressions derived from a consideration of this case. It is difficult to avoid the conclusion that the heat and feeling engendered, the bitterness and the disappointment aroused, the vituperative accusations and invective thrusts arise from the size and totality of the losses which grew out of the very burdensome (and we may add, seemingly unjust) bank stockholders' liability laws of Illinois. The prices at which this stock sold in brighter days was far above par. As a consequence the investor lost the original investment, in addition to being obligated to pay a sum equal to the face of the stock he acquired.

Then, too, defendants have looked too long and intently to locate escapes, until nothing but escapes are within the field of vision or that of their resourceful counsel. Too much attention to judicial precedent, applicable however only to "somewhat similar" cases; too much attention to case study, too little attention to an appraisal of the facts which determine the applicability of said judicial precedents, mark their action. We find, in the story of this case, another instance where the United States Government, with enthusiasm and optimism both worthy and characteristic, sought to help and save a large bank through the loan of a large sum of money. The object was not only to relieve a debtor from distress and the pressure of depositors' demands, but to extend to it an opportunity to recover through a possible rise in the price of its securities which had fallen to prices for below their intrinsic value.

When this loan was made the closing of the bank was imminent. It was unable to meet its withdrawals. The sales of securities to meet such withdrawals were at distress prices, and this meant heavy losses and deeper insolvency. Moreover, it meant the unjust distribution of assets among depositors. In short, closing the doors of this bank on June 28 was awaiting the rise of the morrow's sun.

The stockholders' liability already existed. It was not a possibility. A condition confronted them. Avoidance or reduction in the amount of such liability was possible only through postponement in the date of sale, and a corresponding rise in the value of Central's securities.

It was in this situation that the bank obtained a loan from the plaintiff. The only loser was the plaintiff. Half of what is here called the $90,000,000 loan might with more propriety have been called a gift.

Under these circumstances it is quite impossible to visualize this guardian angel as a conspirator with the stockholders of

its beneficiary the victims of its conspiracy or as playing the role of one endeavoring to evade or violate a state bank liquidation law enacted to protect bank deposits.

The only party who was a loser in this transaction was the plaintiff. This is the overshadowing single fact of this entire story. Whatever may have been the motives of those who authorized the loan, the fact remains it was done with full knowledge of the facts,—of the bank's inability to repay the loan. Plaintiff therefore must stand its loss. It, however, is entitled to avail itself of all rights and remedies which it possesses to keep its loss to a minimum. Whether it may enforce stockholders' double liability is the only question raised. That question must be settled without violent words or deep emotion.

We have not considered the effect of the ratification, for two reasons: It does not apply to all stockholders, some of them having disposed of their stock after June 27 and before the ratification, and for the other reason, that the matter is fully considered in the opinion of the District Court. Other questions we have not discussed because of the effect of the finding that there was but one loan, and because of the satisfactory discussion which appears in the decision of the District Court.

Concluding as we do that this stockholders' liability was a right which attached when Central gave its note to plaintiff and is enforcible in a direct suit against the stockholders, it follows that the decree should be, and it is hereby, affirmed.